Baldwin, Appellant, *v.* McEldowney.

Argued October 2, 1936.   Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Henry Kauffman,* with him *Louis Little,* for appellant.

*R. A. Applegate,* with him *John Evans Rose,* of *Rose & Eichenauer,* for appellee.

OPINION BY MR. JUSTICE LINN, November 23, 1936:

This appeal is from the refusal to take off a nonsuit in an action for personal injuries. Plaintiff's brother, Hood Whitton, by lease dated July 1, 1933, became lessee for a term of one month, of "All that certain third floor apartment of the building situate and known as

No. 1317 Wylie Avenue, Pittsburgh, Pa." The leasehold had four rooms; the rent was $20.00 a month. Whitton's family consisted of himself, wife and child. The plaintiff resided with him. She paid $2.00 a week for lodging when, as she said, she had the money, and also assisted with the housework. The building was a three-story structure containing a business place on the first floor, an apartment on the second floor and Whitton's four rooms on the third. The kitchen door opened on an iron passageway or fire escape which extended from 1317 Wylie Avenue to the adjoining building, 1315 Wylie Avenue, also owned and let to tenants by defendant, and was used in connection with the rest of the fire escape by the tenants of both buildings as a way from the upper floors down to the back yard for the purpose of depositing garbage and rubbish. The Whittons appear to have gone into possession a few days before July 1st. Plaintiff testified that on that day, after washing dishes, "I was starting down to empty the rubbish. We only had one way to go down, you know, and that was the fire escape, all the way down to the first floor, because we were not allowed to keep garbage up there." The fire escape led "All the way down to the back yard," "where they had barrels for rubbish." She had not been on the fire escape before. She said, "the kitchen door, you know, enters right out on the fire escape." After she took "two or three" steps an iron grating forming part of the fire escape floor, fell through to the second floor section below, and she was injured. Two witnesses, tenants of other apartments in the buildings, testified that about a month before they had observed that this section of the fire escape was defective and had notified defendant's rent collector of the fact.

The lease required the tenant to "keep the premises during the term in good repair" and in addition provided: "The Lessor shall not be liable for any injury or damage to any person or to any property at any time on said premises or building from any cause whatever

which may arise from the use or condition of said premises or building . . . or from any other cause, during said term or any renewal thereof." It also provided that the tenant would not "sub-let the same or any part thereof . . . without the written consent of the Lessor." Appellee calls attention to a third provision that "All rights and liabilities herein given to or imposed upon either of the parties hereto, shall extend to the heirs, executors, administrators, successors, and assigns of such party." The statement of claim averred "plaintiff was a sublessee of part of an apartment at the third floor rear of said premises, 1317 Wylie Avenue."

The learned court below entered a nonsuit and refused to take it off, saying: "The trial judge was of the opinion that the plaintiff was bound by the terms of the lease and therefore could not maintain an action against the lessor for damages due to the dilapidated condition of the premises, and also that she was in the premises unlawfully, not having obtained the consent of the lessor to the subletting to her, and on that account there was no duty on the part of the lessor to maintain the premises in a reasonably safe condition as far as the plaintiff was concerned."

Perhaps the first question to be considered is whether there had been a sub-letting within the meaning of the provision. The evidence will not support a finding that any part of the leasehold had been sub-let or in any way made the subject of exclusive possession of another; at most, it shows that plaintiff became a part of her brother's household in consideration of doing household work and paying $2.00 a week when she had the money. She can hardly be said to have been a lodger (cf. *Davis v. Hartel,* 56 Pa. Superior Ct. 557, 564) as that designation would imply some status more independent of Whitton than the evidence discloses; the relationship had more of the characteristics of master and servant and it was in this relationship that she was employed when injured, as she had been washing dishes and "was starting down

to empty the rubbish." We think the provision in the lease was intended to prohibit a more substantial change in possession than resulted from plaintiff's presence in the household. It is not conceivable that by the words of the provision the parties intended to prevent the tenant's taking a servant who worked outside for others part of the time and also did the family household work in whole or part consideration of the accommodation received. In support of her position, appellant cites *Peaks v. Cobb,* 197 Mass. 554, 83 N. E. 1106, and *Gardiner v. DeSalles,* 13 La. App. 83, 126 So. 739, holding that a lodger is not a sublessee within such a provision.

Defendant did not object at the trial, when the evidence of plaintiff's relationship to the leasehold was received, that it was inconsistent with the averment of subletting quoted from the statement of claim; the mere averment will not deprive the plaintiff, on the record as now presented, of the benefit of the facts actually shown without objection.

Excluding from consideration, for the moment, the exemption of defendant from liability for injury to any person at "any time on said premises or building from any cause whatever . . .," what duty was owing by defendant to plaintiff? The passageway or fire escape was on the exterior of, and formed a connection with, the buildings 1315 and 1317 Wylie Avenue and extended from the third floor to the ground.* It was for the use of all the occupants of both buildings, furnishing a way down for the use of all the occupiers. The construction of such a passageway, apparently appurtenant to all the leaseholds, imposed on defendant a duty to all who should lawfully pass over it. In a sense, defendant retained control of it. What was his obligation? In *Lewin v. Pauli,* 19 Pa. Superior Ct. 447 (see pages 450 and 451) it was held that a landlord was liable for neg-

---

* The photograph Exhibit A seems to indicate that the structure also afforded access to the roof.

ligent maintenance of a stairway used in common by tenants in possession of parts of the building under separate leases. In *Frazier v. McLiesh,* 99 Pa. Superior Ct. 168, the plaintiff, a guest of the tenant of part of the building, was injured by falling into an unguarded areaway on the outside of the house, and was allowed to recover on the theory that the way was for the common use of all the tenants which the landlord must keep reasonably safe for their use. In *Robinson v. Heverin,* 50 Pa. Superior Ct. 546, it was held that a member of the tenant's family was unable to recover in circumstances in which the lessee himself could not recover, where the whole premises was leased to the one tenant.

As between Whitton and the plaintiff, she was an invitee, and, as a member of his household, was entitled to use the fire escape in common with the other tenants and members of their households. What was the landlord's duty to her?

Whitton's agreement to release did not affect the performance of the landlord's duty to the plaintiff, a duty resulting from his knowledge that the passageway would be and was used by his licensees and that the defect, in the absence of warning, would probably result in damage to the user. If the parties had intended to release from the consequences of dangerous condition existing before and known at the time to the landlord, more specific language would have been used to make their agreement clear. The release was "from any cause whatever which may arise from the use or condition of said premises or building . . . or from any other cause, *during said term* or any renewal thereof." This language does not apply to property over which he retained the measure of control necessarily involved.

Was there a breach of duty in the maintenance of the passageway? In the circumstances disclosed, we think that was a question for the jury. The plaintiff testified that before this fall she had not gone over it. It was only a few steps from her kitchen door. A witness who

occupied the third floor of 1315 Wylie Avenue (the adjoining building) since December, 1932, testified that he had noticed that the piece of grating in the floor "was loose in there, and it had fell through once before, and I put it back. I told Mr. Harris about it, the fellow that collected the rent." He also said that he had walked over it but "would always watch it" and had instructed his children not to pass over it.

As we understand the evidence, this fire escape was about 9 feet 11 inches long and between 2 and 3 feet wide and on each side had an iron railing or fence that, in the photographs, gives the impression of being about three feet high. The plaintiff fell through it about half way across its length—a few steps from the kitchen door. A witness said that he noticed that the supports extending longitudinally on each side (on which the floor gratings rested) had, about the center, spread "two inches apart, and there was nothing there to hold it [the two sides supporting the floor] together." While each end of the structure was fastened to or at the buildings, the witness said "in the center there was nothing to hold it," as we understand him, nothing to prevent the frame from spreading. The floor was not a solid piece but was made up of sections of grating resting on iron framework supporting each side of the grating and so constructed that if the supports in the center spread out for want of a cross bar to hold them together, the piece of grating in or near the center would, by the weight of the occupant, fall through.

A witness who occupied an apartment on the second floor, testified that she had never been up on the section through which the plaintiff fell, but from the second floor "used to stand and look at it" and "it looked like one side would come apart." She was so impressed by that fact that she "stopped her [child] from going up there. That is how I came to notice it." She also notified the landlord's rent collector about a month before the accident.

The evidence was sufficient to go to the jury. Also see section 360, Restatement, Torts.

Judgment reversed and new trial granted.