Coradi, Appellant, *v.* Sterling Oil Company.

Argued March 30, 1954. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Kenneth W. Rice,* for appellant.

*Stuart A. Culbertson,* for appellee.

OPINION BY MR. JUSTICE BELL, May 24, 1954:

Plaintiff brought an action in trespass for damages sustained by him when a pole against which he had placed his ladder, broke, and he fell to the ground and was injured. Plaintiff appealed from the judgment non obstante veredicto and on such an appeal plaintiff is entitled to all the evidence which is most favorable to him, together with all reasonable inferences therefrom; and if there be any conflicts in the testi-

mony such conflicts must be resolved in his favor: *Lanni v. P. R. R.*, 371 Pa. 106, 88 A. 2d 887; *Shaw v. P. R. R.*, 374 Pa. 8, 10, 96 A. 2d 923. Considering the evidence in the light most favorable to the plaintiff, he is entitled to the benefit of the following facts:

On December 19, 1949, plaintiff was employed at a service station which since 1941 had been operated by defendant's lessees, Hart & Eiseman, under a lease with defendant. Lessees wished to decorate the premises and especially a light on top of a 12 foot high steel pole. The pole was erected on a concrete island in the driveway between three gasoline pumps which were also on this tiny island. Steel flanges were welded on the bottom of the pole; the bottom of the pole was then affixed to these metal flanges which in turn were bolted to the concrete island; then a small cap or bell-shaped housing was placed over the bottom of the pole, which covered up the flanges and the bolts. A light to illuminate the gas pumps was placed on top of the pole. This pole had been there for 15 years and plaintiff and his employers daily worked around it and often leaned against it. Prior to the accident, no one had ever seen anything the matter with the pole; after the accident, the pole was found to be badly rusted on the inside and this created a dangerous condition. No outside or reasonable inspection would have disclosed this rusted or dangerous condition, but it could have been discovered only by lifting the small cap or bell-shaped housing which covered the bottom of the pole as well as the flanges and the bolts, and then tapping the pole with a hammer.

Lessees, under the terms of this lease, agreed to repair and maintain the premises and to save the lessor harmless "from any liability by reason of any personal injuries to any person on or about the said premises and the lessees further agree that they will assume all

liability and damages which may arise from any damages that may occur either on or in front of said premises." Nevertheless, plaintiff sued the lessor and not the lessees, and proved that defendant from time to time had voluntarily entered upon the premises and repaired damaged pumps and equipment and painted the inside and outside of the station as well as the pole. However, it is important to note that no evidence was produced by plaintiff to show that any repairs were ever made by defendant to the pole; the most defendant did was to have the pole painted several times, including one time three months prior to the accident. Plaintiff proved by a so-called practical expert witness that such a steel pole is likely to oxidize and rust on the inside, and may last 3 years or 75 years, depending upon the kind of steel, the climate, and atmospheric conditions.

Plaintiff seeks to bring himself within the well established principle that a landlord out of possession who gratuitously and voluntarily undertakes to make repairs is liable to a third party if the repairs were negligently made: *Harris v. Lewistown Trust Company,* 326 Pa. 145, 191 A. 34; *Tarnogurski v. Rzepski,* 252 Pa. 507, 97 A. 697; *Theakston v. Kaszak,* 152 Pa. Superior Ct. 576, 33 A. 2d 46; *Lasch v. Cohn,* 130 Pa. Superior Ct. 161, 196 A. 581. The trouble with plaintiff's case is that defendant never made or undertook to make or was obligated to make repairs to the steel pole—at best for plaintiff all defendant did was to paint the pole. Moreover, the rust on the inside of the pole and its consequent dangerous condition could not have been observed by any inspection from the outside, or by any kind of inspection except that detailed above. Under these facts, plaintiff has not brought himself within the above principle of law and the Court below correctly entered a judgment non obstante veredicto.

Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Let us suppose that the defendant had put up a papier-mache' pole, so skillfully and artistically painted that one unacquainted with its intrinsic flimsiness, believing that it was a solid, steel pole, leaned against it and fell to his injury. Could there be any question of the liability of the defendant in such a case?

How would that hypothetical case, in point of liability, differ from the one at bar where the defendant painted a defective pole so as to convey to the world the impression that it was sturdy, solid and safe?

During the many years that Hart and Eiseman operated the gasoline service station, the defendant landlord had often voluntarily made repairs to the station, by fixing the roof, painting the pumps and the station both inside and out. The pole involved in this litigation had been painted only three months prior to the mishap which became the basis for the lawsuit. Following the accident, it was discovered that the pole in question was badly rusted and at the breaking point had deteriorated to paper thinness. One of the plaintiff witnesses testified that as far back as 1941 he had worked on this pole and that while employed by the defendant company it was his job "to maintain and repair anything owned or leased to Hart Eiseman by the Sterling Oil Division." This would include "pumps, poles, tanks, building, air compressor, water pump, hoist, oil dispensing equipment."

The law is clear that even though a landlord is not required to make repairs on the leased premises, he is liable if in voluntarily making repairs, he performs the work negligently. Thus, although there was no obligation on the part of the defendant here to guarantee the solidity of the pole which brought the plain-

tiff to grief, there was certainly a moral and legal responsibility on its part not to proclaim that it was a good, reliable pole when the slightest investigation or inspection would have revealed a contrary condition.

It is a matter of every day observation (and a melancholy one too) that Time with invisible hammer is constantly striking at every physical object seeking to reduce it to its original elements of unassembled atoms and particles. Dust to dust applies to telegraph poles, electric light poles, barber poles and gasoline stations, as well as to human beings. The defendant simply had no right to say to the world: *This is a good, strong pole,* when, through its agents and employes, it knew that the pole had been subjected to the freezing weather of twenty winters and the blistering heat of twenty summers, as well as the little fortuitous bumps, shoves and pushes of careless motorists and workers, which, through the years could amount to the cumulative battering strength of a sledge hammer blow.

Justice MAXEY in the case of *Pope v. Reading Co.,* 304 Pa. 326, 333, sententiously summed up this factual-legal phenomenon in the following language: "Negligence has been often and authoritatively defined as 'want of care under the circumstances.' The word 'circumstances' is comprehensive. It embraces the entire sum of the attendant facts, including the operation of the forces of nature so far as they bear upon or relate to the happening of the central event. A person is charged with ordinary knowledge of the workings of these forces, and his conduct, if it is to escape being stigmatized as wanting in care, must conform to the normal workings of the forces of nature. . .

"When a person dams a large body of water at a point in a valley above human habitations, he is chargeable with the knowledge that pressure of that body of water will be exerted against that dam, and if it

overcomes it the water will rush down into the valley, carrying death and destruction. Therefore, he must so build and maintain his dam as to withstand the water's pressure. Not only must he have a care in the building of the dam, but he must continually give the dam due inspection so that signs of deterioration may be noted and steps taken to overcome nature's disintegrating processes. A person in possession and charge of a stone wall adjoining a place where other persons have a right to be must consider the fact that even walls of stone and concrete deteriorate and may become a menace to human safety."

By the same reasoning, steel poles may become a menace to human safety if not inspected from time to time. When the defendant company painted the pole in question, not once or twice, but practically every year, it gave notice to the world that it had taken supervisory jurisdiction over the pole and that it was in good condition.

The public has become accustomed to the slogan, popularized by paint companies: *Save the surface and you save all.* The slogan is ingenious, but, mixed with its glittering, epigrammatic varnish, there is a goodly quantity of pigment which cannot be described otherwise than unashamed mendacity. No superficial covering can keep out the burrowing termites that work their way into the deepest texture of the most solid timber. Nevertheless, mankind accepts fresh paint as a guarantee of wholesome firmness beneath the shining, healthy-looking newness which paint imparts to everything it covers. The defendant company here, I repeat, simply had no right to paint the pole and thus convey the impression to the world that it was a sturdy, steel stanchion when, in point of fact, it was so defective that when a man's weight was set against it, it snapped like a tooth pick, precipitating the plaintiff

here to the pavement with consequent serious injuries.

In the recent case of *Smith v. Kravitz,* 173 Pa. Superior Ct. 11, 14, the plaintiff was injured when her foot went through the kitchen floor which had been repaired by the landlord who was under no duty to make such repairs. In affirming the verdict the plaintiff obtained in the court below, Judge GUNTHER, speaking for the Superior Court, said: "The carpenter performed work in and about the area complained of in such manner as to hold out to the tenant that the whole dangerous area had been repaired. The gist of appellant's negligence is that the insufficient repairs gave a deceptive appearance of safety and thereby led the tenant and her guests to use the floor in a way which, but for the repairs, they would recognize to be dangerous . . . Although it does not appear that appellant or his workman expressly told the tenant that the floor was fully repaired, such was the clear implication which the jury was warranted in finding from the fact that the carpenter came for that very purpose, worked for several hours in and about the dangerous area, and finally announced that he was finished. Mrs. Terrell was warranted, as the jury found, in relying thereafter on the safety of the floor she naturally assumed had been fully repaired."

In the case at bar, Leo Coradi, the plaintiff, had the right to assume that since the defendant company had regularly been painting the pole it had the strength its outer painted appearance proclaimed.

The lower court, in granting judgment n.o.v., said: "We will concede that if they had painted over a rusty condition which concealed a danger obvious to them, they might be considered negligent, but there is no evidence that there was any apparent danger, in fact, the evidence is that there was no indication of rust on the outside of the pole."

This is like saying that there is no evidence of gold at the bottom of the sea because it cannot be seen. Naturally the blanketing waters conceal what is beneath. Only those who painted the pole can tell us whether there was rust on the outside of the pole. The witness, Stanley Boarts, who examined the pole immediately after the accident, testified: "Q. What did you see on the interior or exterior of the pole? A. Rust. Q. What was the condition of the exterior at that point? A. It was covered with paint. Q. And could you observe the rust under the paint, through the paint? A. No, on the inside. Q. Did you touch the inside of the pole at all? A. Yes. Q. What did you find upon touching it? A. Rust. Q. Did you run your hand around it? A. Yes."

It will be noted that the witness said he could not observe rust on the outside because the outside was covered with paint. It was for the jury to decide whether the processes of oxidation had advanced so far that the rust would have been observible on the outside at the time the covering paint swallowed and obliterated it.

At the trial, the court, in affirming a plaintiff's point for charge, instructed the jury as follows: "The defendant landlord was not required under the terms of his lease with Hart & Eiseman to make repairs but if you find from the evidence that they undertook to do so, that is, did make repairs to the building and equipment of the gasoline station where plaintiff was injured and that said repairs were negligently made and the defendant's negligence in making the repairs caused the injury to the plaintiff, the defendant would be liable for plaintiff's injuries even though the repairs were a gratuitous undertaking."

The jury, in its verdict, answered this question in the affirmative. Why then did the court repudiate

the very finding that it had asked the Jury to determine?

I dissent.