Ucci *v.* Keane, Appellant.

Argued November 21, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Thomas Raeburn White, Jr.,* with him *White & Williams,* for appellant.

*Thomas Z. Minehart,* with him *Maurice A. Bank, Melvin Alan Bank,* and *Bank & Minehart,* and *Wilderman & Markowitz,* for appellee.

OPINION BY MR. JUSTICE EAGEN, January 16, 1961:

This appeal is from the entry of judgment on a verdict for plaintiff which followed the lower court's decision overruling original defendant's motions for judgment non obstante veredicto and for a new trial. The appeal is predicated solely on alleged error by the court in denying the motion for judgment n.o.v.

On October 26, 1956, plaintiff, Leonard D. Ucci, was engaged in the performance of his duties as a sheet metal mechanic on a job involving the installation of air conditioning ducts in a building then being built by the Chrysler Corporation in Newark, Delaware. In the course of this operation it became necessary to attach to and suspend from the structural steel members of the plant flat bars of steel, in the trade referred to as "hanger straps", to which, in turn, were to be attached joined sections of the duct assembled on the floor below. Used for the purpose of appending the hangar straps to the structural steel was a power tool, named the "Drive-it 330" and, in the trade, called simply (but appropriately) a gun. Its ammunition, however, was a pin which was propelled through an eight and a half inch barrel following the discharge of a cartridge which was fired by the squeezing of a trigger. When thus shot, this pin would become embedded in

the steel and its threaded end "would be sticking out" therefrom and over that end would be placed punched holes in the hangar straps which were then secured to the structural steel by a nut or bolt.

At approximately 10:00 or 10:30 a.m. on the day in question, plaintiff pulled the trigger and the pin, for the first time in plaintiff's and his foreman's experience with the gun's usage, completely penetrated the half-inch steel into which it had been fired. It was finally retrieved from plaintiff's sleeve, but only after it had passed through his right forearm. This lamentable turn of events transpired when plaintiff, left-handed, and more than twenty feet in the air over the plant's floor, wielded the gun in his left hand and used his right hand and arm, on the other side of the steel into which he was firing, for support while in a position which necessitated same. It would appear from the record that plaintiff's right arm was not, at the moment of the firing, in the path of the projectile but, rather, that because of the great recoil of the gun his entire body was caused to shift, thus bringing the supporting arm into the ultimate path, but unintended course, of the fired pin.

In this trespass action brought by Ucci against the party who had sold the "Drive-it 330" and the cartridges therefor to plaintiff's employer, the jury returned a directed verdict in favor of the additional defendant (plaintiff's employer) and a verdict in favor of Ucci against the vendor of the tool in the amount of $7,600.

In passing upon the motion for judgment non obstante veredicto, the testimony must be viewed in the light most favorable to plaintiff, in whose favor the verdict was returned, resolving all conflicts therein in his favor, and giving him the benefit of every fact and inference of fact, pertaining to the issues involved, which can reasonably be deduced from the evidence.

*Shaffer v. Baylor's Lake Association, Inc.*, 392 Pa. 493, 141 A. 2d 583 (1958) ; *Coradi v. Sterling Oil Company*, 378 Pa. 68, 105 A. 2d 98 (1954).

The light with which the testimony must be so viewed must emanate from the lamp of impartiality which, while focused on the scale of justice, shows a weight in the measurement of which natural sympathies can play no part. Ours is the function of determining whether, in a given case, a basis exists from which actionable negligence can be said to have arisen. We find no such basis in the matter now before us.

The instrument in question had been used for some time previous to October 24, 1956, by plaintiff's foreman. Being dissatisfied with its performance, he "called the office up" (apparently the office of his employer) and "told them (he) didn't want to use it in the field (and) to bring the old one (a 'Ramset') back again." This was done and the "Drive-it 330" was returned either to the seller or to the manufacturer. In any event, about a week later, two representatives, one each from the seller and the manufacturer, appeared on the job site with the gun and "wanted to know what was wrong." It is obvious that the foreman was afraid to use it. Its great recoil was the cause of his concern because the four inch square shield on the muzzle of the gun, instead of remaining flush with the object against which it was placed before firing, had, with the pulling of the trigger, recoiled or pushed back. But it is plain that the fear the foreman entertained, that of a threatened ricochet of the pin, never materialized. His testimony on this point was that, with the recoil as it was, "if the pin didn't penetrate the steel, it might shoot it right back at you." This never happened.

The representative of the manufacturer, by way of attempting to lessen the strength of recoil, cut about an inch and a half from the spring. He then set the

gun at a number seven setting (the exact significance of which is left by the record to conjecture), test fired the gun, and handed it to the foreman indicating that, at that setting, the gun could satisfactorily be used on the entire job. It was only after this interview, but perhaps not because of it, that plaintiff came to use the tool. He said he used it for about two days, a total of thirty to thirty-one times before the accident occurred. He testified that he had been using power tools similar to the "Drive-it 330" for five or six years before this, and that this particular gun "kicked", i.e., recoiled, every time. It was satisfactorily shown, on the trial, that neither plaintiff nor his foreman ever changed the setting, number seven, on the gun after the recommendation of the manufacturer's representative.

Inevitably, we must seek out the cause of the accident. But, in this endeavor we are confronted with a distinct lack of proof. It is alleged that the gun was defective. Even for this general proposition there is little likelihood and less proof. The recoil might well have been simply characteristic of the "Drive-it 330". The "Ramset", previously alluded to, had been earlier used on the same job for the same purpose and, apparently, with satisfactory results. It used a 22 caliber cartridge. Then, the 25 caliber "Drive-it 330", with all its recoil, was again resorted to. Was the gun's recoil a hallmark of intrinsic defect or may it not have been merely characteristic of the model? The record is surprisingly unrevealing on this point. But, quite aside from that, it is well established that "Proof of injury alone, without more, or of the existence of the negligent condition without showing that it caused the injury complained of, is insufficient to establish a case of liability." *Burns v. City of Pittsburgh*, 320 Pa. 92, 94, 181 Atl. 487 (1935). It is not enough that a defect exist which could not, even conceivably, have caused

the accident. "Proving that an accident happened, or the existence of an opportunity for it to happen in the manner alleged, is entirely insufficient to establish negligence: Stern v. Reading, 255 Pa. 96, 99 Atl. 367 (1916). Plaintiff must go further and show not only defendant's negligence, but that the injuries complained of were the result of such negligence.": *Houston v. Rep. Ath. Assn.*, 343 Pa. 218, 220, 22 A. 2d 715 (1941).

With these authorities in mind, we regard as inescapably fatal the fact that the recoil of this gun, even if (although there is no proof of it) it be assumed for purposes of argument to have been excessive and defective, could not even conceivably have caused the pin to jet through the structural steel as if the latter were so much paper. It, the gun, had recoiled "every time", but this was the first time that the projectile ever went in and came out the other side. It was this oddity (left entirely unexplained), and not the recoil, that caused the accident. What it was that caused the pin to pass completely through the steel is left for surmise. Was it a defective cartridge? If so, there is no proof for this. Was the steel in some way defective?

We are fully cognizant of the fact that the recoil caused plaintiff's right arm to shift into the line of fire. But between that arm and the gun was a thickness of structural steel that plaintiff had never known to have ever been pierced under similar conditions. The foreman had fired this gun a hundred to a hundred and twenty times before the accident and approximately thirty times on the day of the miscarriage. The setting was never changed; the recoil was always present; the steel was never pierced; the workers were never hurt.

In view of our conclusion that there was no showing of proximate cause as between the alleged negligence and the injuries sustained, we find it unneces-

sary to discuss the standard and degree of care owing from the seller of goods to a foreseeable user thereof, although this was a subject of concern below. We have studied the record with extreme care and, as to the cause of this accident, we are at a complete loss. We are accordingly convinced that there exists in the record no legitimate basis upon which liability in the appellant can be predicated. An accident happened. We believe it was due to no fault of the plaintiff. But we believe, with no less fervor, that there is not the slightest foundation of fact or proof upon which a finding of actionable negligence on the part of the appellant could legally be based.

Judgment reversed and the court below is directed to enter judgment for the defendant.

Mr. Justice MUSMANNO and Mr. Justice COHEN dissent.