Howard LARSON

v.

DAUPHIN REALTY COMPANY, Inc., Daniel V. Straff, Raymond Straff, Washington Hotel Garage,

v.

Joseph PRAGER and Pearl Prager.

Civ. A. No. 26847.

United States District Court
E. D. Pennsylvania.

Jan. 8, 1964.

990

John F. Naulty, Philadelphia, Pa., for plaintiff.

John J. O'Brien, Jr., O'Brien & Pressman, Philadelphia, Pa., for Dauphin Realty Co.

Albert Bricklin, Bennett & Bricklin, Philadelphia, Pa., for defendants Straff.

Maurice M. Green, Philadelphia, Pa., for defendants Prager.

WOOD, District Judge.

On January 14, 1958, the plaintiff, an elevator repairman, was seriously injured when an outside concrete platform on which he was standing collapsed at 2240 Germantown Avenue, Philadelphia, Pennsylvania. This premises, the Washington Hotel Garage, was operated by the defendants Daniel V. Straff and Raymond Straff (Straffs) pursuant to a *sublease* dated May 1, 1953, entered into with Joseph Prager and Pearl Prager (Pragers) who in turn had leased the premises from the Dauphin Realty Company (Dauphin) under a lease dated the same day—May 1, 1953. The original lease, in a rider agreement at paragraph 7, acknowledged the sublease to the Straffs who had entered into possession of the garage on April 25, 1953.

The lease and sublease provided that all repairs to the premises would be made by the tenant with the exception of the roof which Dauphin specifically contracted to maintain and repair. The Straffs had paid their rent to the Pragers until October or November, 1957, when judgment was entered on the lease against the Pragers by Dauphin and an attachment issued against the Straffs directing them to pay all further rents to Dauphin.

Plaintiff originally sued Dauphin and the Straffs and Dauphin joined the Pragers as third-party defendants pursuant to an indemnity clause in the lease between Dauphin and the Pragers whereby the Pragers assumed responsibility for all injuries occurring to any person on the premises regardless of the negligence of the lessor.

Trial was had to a jury from October 8 through October 14, 1963, and the jury

rendered a verdict in favor of the plaintiff against the Straffs and Dauphin in the sum of $86,000.00 and in favor of the Pragers against Dauphin in the third-party action. Now, Dauphin seeks judgment notwithstanding the verdict or a new trial in both actions.

Dauphin asserts that there was no evidence upon which the jury could find that any defect or dangerous condition existed on the premises prior to May 1, 1953 when the landlord, Dauphin, gave up possession under the lease. And further, Dauphin claims that under the law of Pennsylvania any painting by the landlord of the metal supports of this balcony did not constitute repairs. Also, that the defect was discoverable by a reasonable inspection by the Straffs at any time prior to the accident, and finally, that the Court erroneously instructed the jury regarding Pragers' obligations to Dauphin under the lease.

The tenant's (Straffs) liability in this matter is unquestioned and it is the landlord's (Dauphin) responsibility which is in issue along with its rights under the lease for indemnity from the Pragers.

The platform in question was situated on a 45 degree angle in the corner of the building and was contiguous to an inside fire tower which was a means of ingress and egress from the third floor to the roof where the elevator controls were located in a penthouse. The platform was supported by an "L" shaped six-inch angle iron, the vertical leg of which was attached to the wall and covered by concrete and a horizontal leg which was visible and supported the underside of the platform. Also, two outside hand rails ran between the two doorways of the fire tower.

On the date in question the plaintiff had gone to the garage to service the elevator in the building. He went to the third floor and opened the fire tower door and stepped out onto the platform which immediately collapsed and hurtled him to the second floor below where he was found 10 to 15 minutes later by Daniel V. Straff.

The plaintiff being a business visitor to the premises was entitled to be warned of the dangerous condition which existed on this platform. In Greco v. 7-Up Bottling Co. of Pgh., et al., 401 Pa. 434, 446, 165 A.2d 5, 10 (1960), the Supreme Court of Pennsylvania held:

"* * * 'But the duty of reasonable care and diligence may in certain circumstances impose something more than a mere cursory observation. It is clear that *landowners* have a duty to correct or warn business visitors or invitees not only of defects which are obvious or observable but also those discoverable by a proper or reasonable inspection. Miller v. Hickey, supra, 368 Pa. 317, 325, 81 A.2d 910; Coradi v. Sterling Oil Company, supra, 378 Pa. 68, 70, 71, 105 A.2d 98; Philadelphia Ritz Carlton Co. v. Philadelphia, 282 Pa. 301, 304, 305, 127 A. 843. A latent defect by its very nature is not obvious; but the circumstances may be such as to lead a reasonable and prudent person to make an investigation. *That which amounts to a reasonable inspection is a matter to be determined from the circumstances of each case.*'" (Emphasis supplied)

In the instant case there was testimony from S. A. Keast, a structural engineer, that the type of concrete used in the platform was a type utilized between 1913 and 1919 or even the 1890s.[1] This testimony indicated that this portion of the building was at least thirty-four years old when the lease was entered into in 1953. The platform was exposed to the elements and the flat part of the angle iron between the concrete slab and the wall was corroded the most. (N.T.

---

1. His exact words were, at p. 167 of the record: "How old was that construction? Well, that type of construction I would say would go back to about at least in the teens." Also see p. 178, where he stated: "Well it might have been in the nineties, but probably in the teens."

176) This was due to the fact that moisture and dirt had accumulated between the iron and the wall. (N.T. 176) Mr. Keast further testified that the corrosion in this area "started sometime after it was painted if it was painted. Otherwise it would have started immediately." (N.T. 175) This expert stated that this angle iron could have been easily inspected by means of a sharp instrument probing the area between the slab and the wall and such an inspection would have revealed the corrosion and should have been done every three or four years. (N.T. 175)

As to the design of the platform, Mr. Keast stated that the design was a type used in the early days of construction, " * * * but we have found since that it is not a good type of construction. In other words, a combination of steel and concrete does not make a good combination where exposed to the weather. The reason for that is that the weather, the frost and so forth, gets in between the metal sometimes and the concrete and expansion and contraction and corrosion disintegrate it and causes the material to finally collapse." (N.T. 173) The corrosion of the iron against the wall was sufficient after thirty years to cause the platform to be dangerous (N.T. 182). This would have created a dangerous condition at the time the original lease was entered into in 1953. It was for the jury to decide whether Dauphin met the standard of reasonable care and diligence in inspecting this portion of the premises at the time of the leasing to Prager.[2] This is particularly true in view of the design of the structure and its exposure to the elements. Greco v. 7-Up Bottling Co. of Pgh., supra, 401 Pa. p. 445, 165 A.2d p. 10. Also, as has been stated, the Straffs were already in possession of the premises on April 25, 1953 (N.T. 80) some six days before the lease and sublease were entered into on May 1, 1953. The landlord Dauphin had reason to believe that the Pragers would make no inspection of the premises since they immediately sublet to the Straffs. Under these facts it was a jury question whether the landlord should have taken steps to uncover and correct this dangerous condition to prevent injury to a *business visitor* such as the plaintiff. Harris v. Lewistown Trust Company, 326 Pa. 145, 153, 191 A. 34, 110 A.L.R. 749 (1937).

Dauphin argues that it was not in control of this platform since all repairs were to be made by the Pragers and Straff Brothers. There was testimony by Daniel V. Straff that Dauphin had sent maintenance men on occasion to paint the handrails and outer beam of the platform. (N.T. 81)

In Greco v. 7-Up Bottling Co. of Pgh., et al., supra, 401 Pa. p. 443, 165 A.2d p. 9, the Supreme Court held that a landlord who under a *second* lease was not obligated to make repairs to any part of the structure, but had contracted with a *third party* to *paint* the exterior of the building *assumed control of the exterior* of the building and was obligated to warn any business visitor or invitee of any defects discoverable by a reasonable inspection in this exterior portion of the structure.

The record shows that Dauphin was the only party which painted this platform and by this voluntary act it assumed control of the platform. No inspection was ever made by the landlord or the Straffs who were in possession.

Dauphin relies very heavily on Coradi v. Sterling Oil Company, 378 Pa. 68, 69, 105 A.2d 98 (1954), which held that a landlord was not liable under Harris v. Lewistown Trust Company, supra, when he voluntarily painted the outside of a steel pole which collapsed because of its internal corroded condition. Such painting was held not to constitute repairs and the Supreme Court affirmed judgment non obstante veredicto for the defendant landlord because the rusted condition was not discoverable by a *reasonable inspection*.

---

2. Wilson v. Lamberton, 102 F.2d 506 (3 Cir. 1939).

It would appear from this case that the Pennsylvania Supreme Court made a blanket holding that all painting is not repairs. However, an examination of the paper books in this case reveals the following fact at page 22 of the appellee landlord's brief:

> "* * * the painting was done for *decorating purposes* only and not for the purpose of making any repairs to any known defective condition on the premises."

There was no reason to even consider whether the painting in Coradi was in the nature of repairs and the above-quoted language recognizes that there could be an occasion when painting could constitute repairs.

Coradi is distinguishable from Greco v. 7-Up Bottling Co. of Pgh., et al., supra, insofar as in Greco the Supreme Court found voluntary painting by the landlord to be an act evidencing his *control* of the area of the building where the injury occurred. The Supreme Court further held that the rotted condition of the window frame could have been discovered by the landlord "* * * by manually tapping on the frame whereby both tactilely and aurally its condition would be established." (401 Pa. p. 445, 165 A.2d p. 10) This was found to be a *reasonable inspection* even though the defect was latent.

So in the case at issue, the rusted condition of the platform between the slab and the wall and the rusted condition underneath could have been discovered by a reasonable inspection by Dauphin who by voluntarily painting the platform had assumed control of this part of the building. Dauphin never presented any evidence that its painting was done for decorative purposes and this became an issue of fact for the jury to determine whether the painting was repairs or not. Particularly is this true when all of the plaintiff's experts testified that painting and caulking of the platform were the proper methods of maintenance and repair of the structure. (See N.T. pp. 116, 117, 171, 175, 177.)

Therefore, it was a proper issue of fact for the jury to determine whether this painting, done by Dauphin, voluntarily, was repairs and further, if it did constitute repairs whether it was negligently done as to bring the landlord within the recognized exception that a landlord out of possession who gratuitously or voluntarily undertakes repairs is liable for any injury resulting from his negligence. Harris v. Lewistown Trust Company, supra.

Dauphin further argues that no evidence was presented to the jury as to when the painting took place so that they could not determine that the painting took place prior to the accident in 1958. This argument completely ignores all the testimony of plaintiff's expert, Mr. Keast, who saw the remains of the platform two years after the accident, still laying on the second floor and that the platform had not been reconstructed. (N.T. 164, 179) The only possible inference the jury could make was that the painting was performed before 1958.

## THIRD-PARTY ACTION

In our charge to the jury we read the applicable portion of the lease which created an indemnity right in Dauphin from the Pragers for any liability which may befall Dauphin during the term of the lease. (N.T. 245) We also charged the jury that the Pragers were not liable if when the lease commenced there existed some defect of which they were unaware and the landlord knew or should have known of such a defect and did not notify the tenant of its existence. From the facts as previously stated Dauphin knew that Pragers would not make an inspection since they simultaneously sublet the premises to Straffs who were already in possession before the lease was signed on May 1, 1953. Dauphin consented to this subletting as evidenced by paragraph 7 of the rider agreement attached to the lease and by the resolution of its Board of Directors dated April 30, 1953, incorporated into the lease. There also was a jury question as to whether the condition causing the injury

existed *before* the date of the lease and was not covered by the indemnity clause. An exculpatory clause in a lease will be construed strongly against the landlord. Law v. Reading Company, 312 F.2d 841 (3 Cir. 1963). It has been held that such a provision did not release a landlord from the consequences of a dangerous condition existing before the execution of a lease and known to the landlord at that time. Baldwin v. McEldowney, 324 Pa. 399, 188 A. 154 (1936).

Also, Dauphin had entered judgment against the Pragers on the lease for non-payment of rent in October, 1957, and attached all rents due thereafter from the Straffs. Under the provisions of the lease at paragraph 14, non-payment of the rent constituted a breach of the lease and under paragraph 14(2) of the lease " * * * the term of the lease shall determine and become absolutely void without any right on the part of the lessee to save the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken * * *"

By this action on the part of Dauphin they recognized a forfeiture on the part of the Pragers and a termination of the lease some two to three months before the injury to the plaintiff. Therefore, no right of indemnity existed in Dauphin under the forfeited lease.

## MOTION FOR NEW TRIAL

Dauphin objected to the competency of the plaintiff's expert witness, Mr. Thompson, who had been engaged in the structural steel business since 1949 and had examined channels similar to the ones used in the platform in this case. He also examined the remains of the platform on January 16, 1958, two days after the accident. Dauphin further objected to the qualifications of Mr. S. A. Keast, a structural engineer who had been associated with many companies in this capacity since 1926. He also formed his own company in 1953 dealing in structural work for any type of building.

The qualifications of such expert witnesses are subject to the Court's determination of their competency. This determination rests in the sound discretion of the Court and it is for the jury to decide how much weight should be given to expert opinion. Abels v. McDaniel, 199 Pa.Super. 638, 186 A.2d 640 (1962).

We ruled these witnesses to be eminently qualified for the purposes for which they were called and that they possessed the requisite skill and practical experience in their respective fields. Our instructions to the jury properly advised them that whatever weight they attributed to these experts was for them to decide. (N.T. 233, 234) No prejudice resulted to the defendant in this regard.

Dauphin offered no testimony in the course of the trial and relied solely on the evidence presented by the plaintiff's witnesses and the various leases admitted into evidence. No contradictory expert testimony was offered to contravene the plaintiff's expert witnesses. There existed sufficient evidence from which the jury could have found that the dangerous condition existed prior to the lease in 1953 and that Dauphin assumed control of the platform by painting various parts of it and further, that such painting constituted repairs which were negligently performed by Dauphin's employees. Our charge to the jury properly instructed them to determine the nature and purpose of this painting and whether it was negligently done by Dauphin. (N.T. 238, 239, 240) As far as Dauphin is concerned, we find our charge correctly stated the law and was eminently fair in all respects including the supplemental requests which we granted as presented by Dauphin. (N.T. 253, 254, 255). Motions denied.