450 A.2d 615

**Monica SHERK, Administratrix of the Estate of James Louis Sherk, Deceased,**

v.

**DAISY–HEDDON, A DIVISION OF VICTOR COMPTOMETER CORPORATION, Appellant**

v.

**Michael SAENZ, June Saenz, and Robert Saenz.**

Supreme Court of Pennsylvania.

Argued March 1, 1982.

Decided Aug. 23, 1982.

Reargument Denied Oct. 8, 1982.

John W. Jordan, IV, Thompson, Rhodes & Grigsby, Pittsburgh, for appellant.

Peter J. Mansmann, Pittsburgh, for Monica Sherk.

Michael A. Donadee, Neighborhood Legal Services, Pittsburgh, for Michael and June Saenz.

Shelley Bould, Pittsburgh, for Robert Saenz.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, McDERMOTT and HUTCHINSON, JJ.

## OPINION

ROBERTS, Justice.

This is an action in trespass filed by the administratrix of the estate of James Sherk against appellant-defendant Daisy-Heddon in the Court of Common Pleas of Allegheny County on counts of strict liability, Restatement (Second) of Torts § 402A, misrepresentation, Restatement (Second) of Torts § 402B, and negligence. The administratrix, the appellee on this appeal, seeks damages for the death of James Sherk, who died after having been struck in the head by a "B–B" fired from a Daisy Power King Model 880 pump-up air rifle by Robert Saenz, a friend of the decedent. At trial appellee proceeded against appellant on the theory that

appellant, the manufacturer of the air rifle, had failed to provide an adequate warning of the rifle's lethal propensity and that the alleged failure to warn of the lethal propensity of the air rifle had caused James Sherk's death. At the close of the evidence, the trial court submitted the case to the jury with instructions on the count of strict liability, but denied appellee's request that the jury be instructed on the counts of misrepresentation and negligence.

The jury returned a verdict in favor of appellant, but on appeal a panel of the Superior Court (Lipez, J., dissenting) reversed the judgment entered upon the verdict and remanded for a new trial. 285 Pa.Super. 320, 427 A.2d 657 (1981). The Superior Court upheld the trial court's refusal to submit the count of misrepresentation to the jury,[1] but deemed a new trial to be necessary because, in its view, the trial court had improperly refused to charge the jury on negligence and had erroneously excluded evidence of the "community's perception" that BB guns previously marketed by appellant had been non-lethal.[2]

Because the evidence presented at trial, including plaintiff-appellee's own evidence, precluded a finding that the allegedly inadequate warnings accompanying the Power King air rifle caused James Sherk's death, we conclude that the Superior Court erred in disturbing the judgment of the trial court. Hence, we reverse the order of the Superior

1. No appeal has been taken from this aspect of the Superior Court's ruling.

2. Plaintiff had sought to demonstrate through the excluded evidence that the lethal propensity of the Daisy Power King air rifle would not generally have been known by the public without a warning to that effect. See Restatement (Second) of Torts § 402A comment j (1965) (warning not required "when the danger, or potentiality of danger, is generally known and recognized"). The excluded evidence included advertisements of Daisy products other than the Power King that had not been seen by Robert Saenz or his parents.

Plaintiff did establish the non-lethal propensity of previously marketed Daisy products through the testimony of the Director of Product Evaluation and the Director of Research and Development for Daisy-Heddon.

Court and reinstate the judgment entered upon the jury's verdict in favor of appellant.[3]

## I

■ While the Superior Court properly held that a plaintiff may proceed on theories of both negligence and strict liability, see *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974), it erroneously concluded that the trial court's failure to charge on negligence or to admit the challenged evidence requires a new trial. Liability in negligence or strict liability is not imposed upon a manufacturer simply for the manufacture of a defective product. Rather, the plaintiff must demonstrate that the injuries sustained were proximately caused by the product's defect. See *Azzarello v. Black Bros. Co.*, 480 Pa. 547, 391 A.2d 1020 (1978); *Berkebile v. Brantley Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975). See also *Kuisis v. Baldwin-Lima-Hamilton Corp.*, supra. The claimed "defect" in the Daisy Power King Model 880 pump-up air rifle was the alleged failure on the part of appellant Daisy-Heddon to provide an adequate warning of the Power King's lethal propensity. Although appellee proceeded on the theory that if the lethal propensity had been known, Robert Saenz would never have directed the Power King at James Sherk's head, appellee's proof established facts from which it must be concluded that Robert Saenz was legally chargeable with knowledge of the Power King's lethal propensity.

Robert Saenz, who was fourteen years old on the day of the shooting, testified that on that day he and James Sherk had been firing the Power King at glass bottles and tin cans from a distance of fifteen to twenty feet. Robert Saenz was aware that "depend[ing] on how many times you pumped

---

**3.** This case was reassigned to this writer on June 28, 1982.

Robert Saenz testified on behalf of plaintiff-appellee, as did his parents, June and Michael Saenz. Both Robert Saenz and his parents were also additional defendants, having been joined by appellant. The trial court directed a verdict in favor of Mr. and Mrs. Saenz and the jury returned a verdict in favor of Robert Saenz along with its verdict in favor of appellant. The parties do not challenge the determinations relating to Robert Saenz and his parents.

[the rifle] up," the BBs fired from the rifle could shatter the bottles and pierce through the cans. He also testified that he had known that the air rifle was "some[what more] powerful" than the spring BB guns he had previously used. Moreover, he knew that a BB fired from the Power King could blind a person and that he should never point a gun at anyone. Indeed, Robert Saenz testified that he had expected to use the Power King to kill rabbits and rats. He had been told by his father and mother not to use the Power King until his father had instructed him in its use. On the day of the shooting, Robert Saenz used the gun without permission and without having read the instructions accompanying the Power King.[4]

Robert Saenz was familiar with the operation of the Power King. He knew that in order for air to be pumped into the rifle, the bolt had to be opened and the manual safety device had to be pushed to the "on" position, in which position the red mark indicating that the rifle was ready to fire would not be visible. He also knew that the trigger would not fire the rifle when the bolt was open or when the safety was pushed to the "on" position. Robert Saenz admitted that, when he had directed the Power King at the decedent, he knew that the Power King had been pumped with air. He testified that he "just didn't bother" to check the position of the safety device. Instead, he pushed the safety device and "just assumed that it went on safe." In fact, he had pushed the safety from the "on" to the "off" position, thereby enabling the rifle to fire.

Robert Saenz testified that he had stood five feet from the decedent, who was sitting on the ground, and that he had pointed the barrel of the Power King at the decedent's head. He testified that he had "called Jimmy's name," intending that James Sherk would turn and look at him, and then "squeezed the trigger, thinking the safety was on." Robert Saenz further testified, "I was just horsing around,

4. The evidence also establishes that on two other days during the week of the shooting Robert Saenz had used the Power King without his parents' permission.

intended to scare him. I was just fooling around." He said that, when he directed the rifle at James Sherk's head, he knew that "this was something that [he] shouldn't be doing" and "this was something that could injure [his] friend."

This evidence makes it clear that the Power King air rifle was misused by Robert Saenz in a manner that Robert Saenz knew could cause serious bodily injury. Despite his knowledge that BBs fired from the Power King could kill animals and blind a person, Robert Saenz directed the Power King from close range at James Sherk's head.

 Where, as here, the lethal propensity of a gun was known or should have been known to the user, liability cannot be imposed upon the manufacturer merely because the manufacturer allegedly has failed to warn of that propensity. As stated by Dean Prosser,

> "[t]here appears to be no reason to doubt that strict liability has made no change in the rule, well settled in the negligence cases, that the seller of the product is not to be held liable when the consumer makes an abnormal use of it. Sometimes this has been put on the ground that the manufacturer has assumed responsibility only for normal uses; sometimes it has gone off on 'proximate cause.'"

Prosser, *The Fall of the Citadel,* 50 Minn.L.Rev. 791, 824 (1966) (footnote omitted). See *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 32, 319 A.2d 903, 907 (1974) ("a manufacturer by marketing and advertising his product impliedly represents that it is safe for its intended use"); Restatement (Second) of Torts § 402A comment h (1965) ("A product is not in a defective condition when it is safe for normal handling and consumption."). Thus, because this record demonstrates that Robert Saenz is legally chargeable with sufficient appreciation of the nature of the risk of his misuse of the Power King, he is exclusively responsible for the consequences of his misuse.

## II

Appellee cannot prevail on the theory that if the parents of Robert Saenz had known of the Power King's lethal

propensity, they would not have permitted Robert Saenz to have possession of the Power King and thus be in a position to misuse it. The Power King was purchased by Mrs. Saenz from a mail order catalogue at the request of Robert and his older brother Wayne. Mrs. Saenz testified that she had "no knowledge of guns," and did not know "what BB guns look like." She purchased the Power King air rifle without consulting or informing her husband, at a time when her son Wayne "just hit [her] at the right moment with the proper approach." When the rifle arrived in the mail, Mrs. Saenz did not open the box or read the instructions. Instead, the box "was put away," and Mrs. Saenz directed her sons that the gun was not to be used until their father had instructed them in its use. Later that week, Mr. Saenz looked at the gun but did not read the operation and instruction manuals accompanying the Power King. Mr. Saenz testified that he had told Robert not to point the gun at anyone and not to use the gun until he had been instructed by him in its use. Mr. Saenz had intended to read the instructions and to instruct his children in the use of the gun on the upcoming Saturday, the day that the shooting took place.[5]

5. The operation and instruction manuals accompanying the Power King were introduced into evidence. The cover of the operation manual stated: "Built for greater power—much more powerful than other non-powder guns." The text of the operation manual further stated:

"The Pump-Up Air Gun is a new, much more powerful type gun than the traditional Daisy spring-air B•B gun. It shoots with four to six times the power of the spring-air B•B gun and must be treated with great care and respect.

ALWAYS HANDLE A GUN AS IF IT WERE LOADED. 'Handling' means every time you touch your gun. It also means you must never point your gun toward any living thing nor at any part of your own body nor at anything that could be damaged by an accidental shot.

\* \* \* \* \* \*

The more you pump your Daisy, the higher the velocity of the B•B or pellet when it is fired. Two or three pumps are recommended for indoor target shooting. Higher velocity for outdoor shooting can be achieved by pumping the gun up to ten strokes.

CAUTION: Due to the additional power of the Pump-up Air Gun, extra precaution is required in selecting a safe target. You must pick a target that cannot be penetrated or cause a ricochet.

In *Ucci v. Keane,* 402 Pa. 467, 167 A.2d 147 (1961), this Court stated:

"[I]t is well established that 'Proof of injury alone, without more, or of the existence of the negligent condition without showing that it caused the injury complained of, is insufficient to establish a case of liability.' *Burns v. City of Pittsburgh,* 320 Pa. 92, 94, 181 Atl. 487 (1935). It is not enough that a defect exist which could not, even conceivably, have caused the accident. 'Proving that an accident happened, or the existence of an opportunity for it to happen in the manner alleged, is entirely insufficient to establish negligence: *Stern v. Reading,* 255 Pa. 96, 99 Atl. 367 (1916). Plaintiff must go further and show not only defendant's negligence, but that the injuries complained of were the result of such negligence.': *Houston v. Rep.Ath.Assn.,* 343 Pa. 218, 220, 22 A.2d 715 (1941)."

Id., 402 Pa. at 471–72, 167 A.2d at 150. On this record it is clear that the alleged "defect" in the warnings accompanying the Power King air rifle did not cause James Sherk's death. Robert Saenz had possession of the Power King only because he had disobeyed his parents' directions not to use the rifle. Notwithstanding his own knowledge of the Power King's lethal propensity, his knowledge that the rifle should never be pointed at anyone, and his failure to check the position of the safety mechanism, he directed the Power King from close range at James Sherk's head. As this record establishes that James Sherk's death did not result from the allegedly inadequate warnings accompanying the

Spring-air B•B gun targets are not considered a safe target for the Pump-up Air Gun. Hard surfaces will cause a ricochet."
The instruction manual also stated:
"Never point a gun at anyone. Never point a gun at anything you do not want to shoot. Never point your Daisy at any living thing."
Mr. Saenz testified that, had he read these allegedly inadequate instructions, the instructions would "have made a difference to him." He testified that he would have learned of the Power King's "accuracy and velocity" and "would have never let them use it, period. I would have sent it back."
Robert Saenz testified that he, too, had not read the allegedly inadequate instructions accompanying the Power King: "I was just too eager to take it out, that's all."

Power King, appellant was entitled to a verdict in its favor on all counts.

### III

Because the evidence refutes appellee's contention that James Sherk's death was caused by the allegedly inadequate warnings accompanying the Power King, the exclusion of evidence regarding the "community's perception" of BB guns other than the Power King air rifle marketed under the Daisy trademark did not adversely affect appellee's case. Thus, it is unnecessary to address the question of the admissibility of evidence of the "community's perception" of a manufacturer's products. Cf. *Ucci v. Keane,* supra, 402 Pa. at 472–73, 167 A.2d at 150 (plaintiff's failure to show "proximate cause as between the alleged negligence and the injuries sustained," makes it "unnecessary to discuss the standard and degree of care owing from the seller of goods to a foreseeable user").

Order of the Superior Court reversed. Judgment of the Court of Common Pleas of Allegheny County entered upon the jury's verdict in favor of appellant reinstated.

FLAHERTY, J., did not participate in the consideration or decision of this case.

HUTCHINSON, J., joins in this opinion and files a concurring opinion.

McDERMOTT, J., concurs in the result.

LARSEN, J., files a dissenting opinion in which O'BRIEN, C. J., joins.

HUTCHINSON, Justice, concurring.

I join in Justice Roberts' Opinion and concur in his view that plaintiff has failed to show causation. Specifically, plaintiff has failed to establish any causal connection between the asserted inadequacy of defendant's warning and the tragic death of plaintiff's decedent. However, I wish to make clear my view that the issue we are dealing with in

this case is causation in fact, not the legal concept of proximate cause. Taking the evidence, as we must, in the light most favorable to the verdict winner, it is clear the person firing the fatal shot was well aware of the substantial risk of death or serious injury involved in pointing this gun at decedent's head and pulling the trigger. Whatever false expectations of safety the Daisy logo gave the community regarding this high powered air gun, the record shows the youth firing the shot knew the risks a warning would have alerted him to and acted without regard to them. The imposition of liability in any products case, including one based on Section 402A strict liability, requires a showing that the plaintiff's injury was caused by some defect in the product. Thus, where a finding that the product is defective within the meaning of section 402A is predicated on the theory that the manufacturer failed to provide adequate warnings of the dangerous propensities of the product the plaintiff must prove the failure to warn caused plaintiff's injury. *See* Annot., 13 A.L.R.3d 1085 (1967). Regardless of whether Daisy's warnings were inadequate, rendering the product defective under section 402A, plaintiff failed to establish causation because Saenz and his parents knew the risks which an adequate warning would have described and acted without regard to them. *See* Restatement (Second) of Torts, § 402A comment n (1965), *See also Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457 (5th Cir. 1976). Given that circumstance, the trial court's refusal to admit testimony of the Community's perception of the non-deadly nature of Daisy-Heddon air rifles, as that perception related to the adequacy of the warnings, was correct.

It is as if a man fell overboard into the ocean, immediately sinking without a trace. The failure to have a lifeboat ready is not a cause of death. *See* Prosser, Law of Torts § 41 (1971) citing *Ford v. Trident Fisheries Co.,* 232 Mass. 400, 122 N.E. 389 (1919). *But, c.f. Kirincich v. Standard Dredging Co.,* 112 F.2d 163 (3d Cir. 1940) (where there was evidence that the drowning man might have been saved). Whatever the warning furnished by Daisy, it would have

been ineffective in deterring the Saenz youth's conduct. Therefore, any inadequacy in that warning, in the sense it was not aptly designed to overcome the community's failure to appreciate the deadly nature of this particular air gun did not in fact cause plaintiff's decedent's death.

Issues of proximate cause, with its sub sets of intervening or superseding cause, involve the policy decision of selecting a cutoff limit, beyond which the law will not impose liability for the ever expanding but constantly declining force of an act setting in motion a risky set of events. They should not be reached until cause in fact is shown.

The liability imposed on manufacturers of defective products is denominated strict, or without fault, because the usual requirement that plaintiff show a breach of duty has been eliminated, or attenuated to the point of elimination. In such cases, under the principles of section 402A of the Restatement (Second) of Torts, a plaintiff is not required to prove the defendant failed to discharge his duty of care. In addition it either is assumed his duty extends to all users of the product, or that harm from the defect is foreseeable to all users. 2 Dooley, Modern Tort Law § 32.55 (1977). Thus the manufacturer may be liable to any person suffering harm even if he exercised all due care. *See Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975) (plurality opinion). However, plaintiff must prove a defect existed in the product at the time of the accident and that this defect was the proximate cause of plaintiff's injuries. *See Kuisis v. Baldwin-Lima-Hamilton Corp.,* 451 Pa. 321, 319 A.2d 914 (1974). If the policy issues relevant to proximate cause are analyzed in terms of foreseeability, distinct notions relating to cause can be easily confused with those relating to duty in the sense of scope of the risk. Extension of the duty to manufacture a product free of defects to all users may then be incorrectly thought to eliminate the requirement of proximate cause.

On the facts of this case we do not reach the issue of whether a failure to provide adequate warning was the forseeable or proximate cause of plaintiff's injuries because

such failure was not a cause in fact. Accordingly, I do not share the dissent's view that we have "overruled an entire body of Pennsylvania law concerning causation (substantial factor, proximate cause, intervening cause and superseding cause) . . ." *See supra* at 637 (Larsen, J., dissenting).

Strict liability for failure to warn is a means of protecting users of products from generally unrecognized risks in unavoidably dangerous useful products. By bringing the hidden risk home to the user it protects against a use in a manner likely to create that risk. Thus, the product is defective under the doctrine of strict liability if it is unreasonably dangerous without an adequate warning and no such warning is provided. Where the actor knows risk is present and still chooses to act without regard to it, the warning serves no purpose in preventing the particular harm. Imposing liability in such a case cannot be based on any connection between the failure to warn and the harm incurred. It can only follow from the assumption that a manufacturer is an insurer against all harm resulting from use of his product. Such an assumption must either be based on the inarticulated notion that no degree of social utility in a unavoidably dangerous but not defective product can prevent liability, even for fully recognized dangers; or that the degree of utility must be balanced against the nature of the risk by the fact finder. The former view makes all manufacturers insurers against all harm their products cause. The latter leaves to a jury the issue of whether the Daisy pump rifle's deadly propensities outweighed its utility. Neither seems required by our case law.

The dissent argues Daisy's marketing of the pump rifle constituted a substantial factor in causing the injury. That argument, which is superficially appealing, assumes a lethal weapon cannot be marketed without liability for all harm it causes, including harm from an unreasonable use, regardless of the nature and quality of the warnings accompanying it. Accepting this argument would eliminate the requirement that the product be defective and impose liability for harm from unavoidably dangerous propensities regardless of

warning, or knowledge, of those dangers. On that theory, Daisy's marketing of the rifle would constitute a substantial factor in causing the death of the Sherk child, when coupled with Saenz' foreseeable negligence. Such a theory was not advanced at trial, is not supported by the cases and has no relevance to the issue of admissibility of evidence of the community's perception of the deadly nature of Daisy's pump rifle. The proffered testimony was offered on the issue of the adequacy or inadequacy of Daisy's warnings. The arguable absence of adequate warnings plainly did not "cause" plaintiff's injury within any meaning of the word.

LARSEN, Justice, dissenting.

I dissent. The opinion of Mr. Justice Roberts announcing the result of the Court has, in essence, held that *as a matter of law* and without any need to present the issue to the jury, a subsequent negligent act of a second tortfeasor completely absolves an original tortfeasor from any responsibility for his negligent acts, *even though the subsequent act of negligence was eminently foreseeable and was to be expected.* (That opinion states "because this record demonstrates that Robert Saenz is legally chargeable with sufficient appreciation of the nature of the risk of his misuse of the Power King, he is *exclusively responsible* for the consequences of his misuse." At 618; emphasis added).

Such a position misperceives the nature of the defect inherent in the Daisy Power King, and muddles the separate concepts of cause in fact, intervening cause and superceding cause, thereby ignoring and avoiding much of the law of this Commonwealth pertaining to causation of damages. With the decision and result reached by the majority today, Pennsylvania has taken a giant step *backwards* in the development of negligence and products liability law.

In April, 1973, fourteen-year-old Robert Saenz purchased through a mail-order catalogue, with his parents' permission, a Model 880 "Power King" pump-up air rifle manufactured by appellant, the Daisy-Heddon Company (Daisy). On April 7, 1973, while playing with the Power King, Robert uninten-

tionally shot his friend, James Sherk (appellee's decedent, also fourteen), in the head with a BB. The BB penetrated James' skull and traveled five inches through his brain; he died the next day as a result of this wound.

Plaintiff-appellee filed a complaint in trespass setting forth causes of action sounding in negligence, warranty, strict liability (under section 402A of the Restatement (Second) of Torts) and misrepresentation (under section 402B of the Restatement (Second) of Torts). The case was tried before a jury in September, 1977 in the Court of Common Pleas of Allegheny County.

Appellee's theory of the case was predicated upon Daisy's distribution of the gun in an allegedly defective condition due to an absence of adequate warnings (strict liability) and its allegedly negligent conduct in the manufacture, promotion and marketing of the Power King, a lethal weapon, under the "Daisy" logo. That is, appellee attempted to demonstrate that the Daisy logo—a "bull's-eye" target—and Daisy BB-guns generally projected an image of relative safety (i.e., that Daisy BB-guns could sting or injure an eye, but not kill), that the Power King was an aberration from that norm, and that, therefore, the placing of the Power King on the traditional BB-gun market without adequate warnings of the lethal danger rendered Daisy strictly liable under § 402A, liable under negligence principles, and liable for misrepresentation under § 402B.

The Power King arrived in a box bearing the Daisy logo and was accompanied by various warnings and instructions, including a warning not to point the gun at anyone and a statement that the Power King is a much more powerful type of gun than the traditional Daisy BB-gun. However, there were no warnings in the material accompanying the gun, nor in the advertisements or promotional literature, which suggested that the Power King had lethal propensities, nor were there any recommended age limitations.[1] The

1. For more detailed descriptions of the warnings, instructions and advertisements accompanying the Power King, refer to the opinion of the Superior Court per President Judge Cercone. *Sherk v. Daisy-*

trial court allowed appellee to introduce evidence to show how the Saenzes viewed the Daisy logo but refused to allow appellee to introduce evidence of how Daisy BB-guns were perceived generally in the community. The trial court also limited evidence as to how Daisy BB-guns were marketed and advertised to only those ads pertaining specifically to the Power King which the Saenzes themselves had seen.

At trial, Daisy's chief product evaluator, Mr. Guy Braughler, testified regarding an inter-office memo he had written indicating that Daisy had been aware of the deadly nature of the Power King before placing it in the stream of commerce. That memo read, in part:

> This is a dangerous gun, it is not a controlled velocity *play gun for which we are noted.* I am not contradicting the direction and the objective of this unit, it is a needed and welcome addition to our line, but *this gun,* with its absence of proper safety procedures and mechanisms, *invites a dangerous condition,* both in plant and in the consumer's hands. *With the presentation of an unsafe product that has the energy capabilities such as this gun, we could lose the immunity to criticism that we have enjoyed in the toy market.*
>
> To get a feeling for just how dangerous this unit is, I have conducted some penetration tests using the 880 as compared with some of our other models.
>
> . . . .
>
> It is easy to note that the penetration possibilities of the 880 of a ¾ inch depth *opens up new areas of vulnerability when this unit is unsafely used. Whereas we now can injure an eye or irritate the skin, we will be able to inflict a dangerous wound with the high velocity 880.* High velocity is the objective of this gun, and it should not be changed, but we do need to have the unit handled as safely as possible. I do not feel we have succeeded at this requirement in the latest design review. (emphasis added).

*Heddon,* 285 Pa.Super. 320, 427 A.2d 657, 658–59 (1981) (Montgomery, J., filed a concurring opinion; Lipez, J., filed a dissenting opinion).

The trial court refused to give appellee's requested jury instructions on Daisy's potential negligence, to which appellee excepted, and directed a verdict against appellee on the count of negligence as well as on the count of § 402B misrepresentation. On the charge of strict liability, the court rendered the following definition of "defect" (which definition was substantially in accord with the opinion announcing the result of this Court in *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975)):

What do we mean by a defect? The Law says that the manufacturer of a product is the guarantor of its safety. So the product must, therefore, be provided with every element necessary to make it safe for use and without any condition that makes it unsafe for use. If you find that the product at the time it left the defendant's control lacked any element necessary to make it safe for use or contained any condition that made it unsafe for use, then the product was defective and the defendant is liable for harm caused by such defect, if you so find.

Now, even a perfectly made and designed product may be defective if not accompanied by proper warnings and instructions concerning its use. You have the evidence. A supplier must give such warnings and instructions as are required for the user or consumer of the possible risks of using the products or which are created by the inherent limitations in the safety of such use. If you find that such warnings or instructions were not given, the defendant would be liable for the harm caused thereby.

Now, a product is not defective if it is safe for its normal use. And the manufacturer is not required to add a warning when the danger or the potentiality of danger of a product is generally known and recognized. Now, if you find that the product was defective, you still must determine whether or not the defective condition, if such you find, is the legal cause of the harm that is alleged.

The jury returned a verdict for Daisy.

A court en banc denied appellee's motion for a new trial holding that it was not error to exclude evidence regarding

the reputation of other Daisy BB-guns in the community as non-lethal and other evidence demonstrating how the traditional guns were marketed because such evidence was irrelevant, that it was not error to refuse to charge on negligence as "plaintiff failed to show any of the necessary elements", and that there was no § 402B misrepresentation.

On appeal, a panel of the Superior Court affirmed on the § 402B ruling [this portion of the Superior Court decision has not been appealed from], but reversed on the evidentiary rulings and the refusal to charge on negligence, and remanded for a new trial. *Sherk v. Daisy-Heddon,* 285 Pa.Super. 320, 427 A.2d 657 (1981). *See* note 1, *supra.*

The thrust of the opinion of that court was that "ordinary consumer expectations" were a necessary element of a "failure to warn" case in strict liability and that, therefore, evidence of the community's knowledge as to the characteristics of the product and the community's perception of the Daisy logo and image were relevant to the necessity for and adequacy of the warnings, and should, therefore, have been admitted. The opinion further held that the lower court erred in refusing to charge the jury on negligence. This Court granted Daisy's petition for allowance of appeal on June 22, 1981. I would affirm the Superior Court.

## I. *Refusal to Charge on Negligence*

Under the circumstances herein presented, the lower court's refusal to permit the case to proceed to the jury on the negligence theory was erroneous and mandates affirmance of the Superior Court's reversal and grant of a new trial. The opinion of the (lower) court en banc stated: "plaintiff failed to show any of the necessary elements, and therefore was not entitled to a charge on this issue. Negligence is not an issue in a strict liability case. *Berkebile v. Brantly Helicopter Corp.,* 406 Pa. 83, 337 A.2d 893 (1975)." Appellant relies solely on *Berkebile* to support its position that strict products liability and negligence are not alternative theories of recovery and that it is superflous and improper to charge on both.

I agree with the Superior Court's analysis of *Berkebile,* 285 Pa.Superior 333, 427 A.2d at 663:

> We find the court's reliance upon *Berkebile* to be misplaced. In *Berkebile* the plaintiff filed suit against the defendant-manufacturer only under the theory of strict liability. There was no cause of action based on negligence before the *Berkebile* court.... The Supreme Court made no reference to a situation such as that before this Court in which the plaintiff files causes of action for both negligence and strict liability.
>
> However, the Pennsylvania Rules of Civil Procedure would appear to cover this question. In Pa.R.C.P. 1044(a), it states:
>
>> "The plaintiff may state in his complaint two or more causes of action in trespass, triable in the same county, which arise from the same transaction or occurrence or series of transactions or occurrences."
>
> Plaintiff's complaint is in keeping with this Rule.

There is simply no authority in this jurisdiction that requires a plaintiff to choose between causes of action where a product is involved in an injury. Section 402A, comment a, of the Restatement (Second) of Torts, provides that the "rule stated here is *not exclusive,* and does not preclude liability based upon the *alternative ground of negligence* of the seller, where such negligence can be proved." Most of the jurisdictions that have dealt with the issue have concluded that negligence and strict liability are alternative grounds of liability and that, where the evidence supports both causes of action, it is error to refuse to charge on both. Annotation, *Necessity and Propriety of Instructing on Alternative Theories of Negligence or Breach of Warranty, Where Instructions on Strict Liability in Tort is Given in Products Liability Case,* Korpela, 52 A.L.R.3d 101; *see, e.g. Jimenez v. Sears, Roebuck & Co.,* 4 Cal.3d 379, 93 Cal.Rptr. 769, 482 P.2d 681 (1971); *Little v. PPG Industries, Inc.,* 92 Wash.2d 118, 594 P.2d 911; *Hansen v. Cessna Aircraft Co.,* 578 F.2d 679 (7th Cir. 1978); *Jackson v. Coast Paint & Lacquer Co.,* 499 F.2d 809 (9th Cir. 1974); *Calvanese v. W.W.*

*Babcock Company, Inc.,* 10 Mass.App. 726, 412 N.E.2d 895 (1980); *Cartel Capital Corp. v. Fireco,* 81 N.J. 548, 410 A.2d 674 (1980). *But cf. Dorminey v. Harvill Machine, Inc.,* 141 Ga.App. 507, 233 S.E.2d 815 (1977) *and Masi v. R.A. Jones Co.,* 163 N.J.Super. 292, 394 A.2d 888 (1978). In these and numerous other cases, it is recognized that the primary difference between negligence and strict products liability is (or at least theoretically is) that negligence focuses on the *conduct* of the *tortfeasor* while strict liability focuses on the *condition* of the *product.* (The next section (II) will elaborate on this theoretical difference, one which is frequently lost in practice.) Clearly in cases such as this, where the defect is not a manufacturing defect wherein the flaw or blemish is visible or measurable but is perceivable only by reference to external factors, it may be to the plaintiff's advantage to focus on the manufacturer's conduct, *Jimenez v. Sears, Roebuck and Co., supra* 93 Cal.Rptr. at 771, 772–73 at 482 P.2d 683, 684–85, and it is unwarranted to force the plaintiff to elect between negligence and strict liability theories where both are supported by evidence. *Id.* 93 Cal.Rptr. at 774, 482 P.2d at 686; *Howes v. Deere & Co.,* 71 Wis.2d 268, 238 N.W.2d 76 (1976); *Jahnig v. Coisman,* 283 N.W.2d 557 (S.D.1979).

As there is no prohibition to charging a jury on both theories, it is left to examine the court's statement "plaintiff has failed to show any of the necessary elements [of negligence]." Under the evidence presented in this case, this statement is erroneous: all of the elements were presented.[2] This Court has defined negligence as "the want of due care which a reasonable man would exercise under the circumstances." *Gift v. Palmer,* 392 Pa. 628, 630, 141 A.2d 408 (1958) (citations omitted). "Conduct is negligent only if the harmful consequences thereof could reasonably have been foreseen and prevented by the exercise of reasonable care." *Id.* (citations omitted). Essentially then, a cause of action

2. In its brief, appellant does not even posit the contention that the elements of negligence were lacking. As noted, appellant has instead relied solely, and erroneously, on *Berkebile v. Brantly Helicopter Corp., supra.*

for negligence exists where there is a duty or obligation on the part of the actor to conform to certain standards of conduct for the protection of others against foreseeable risks, a failure on the actor's part to conform his conduct to the standard required (breach of duty), and a reasonably close causal connection between the conduct and the resulting injury. *Macina v. McAdams,* 280 Pa.Super. 115, 421 A.2d 432, 434 (1980); *Thompson v. Reading Co.,* 343 Pa. 585, 23 A.2d 729 (1942); *Gift v. Palmer, supra;* (see section III *infra* regarding the element of causation).

Tort law is predicated on a social policy that protects a plaintiff's interest, as a member of a class of people to whom a duty is owed, to be free from unreasonable risks of injury. *Hahn v. Atlantic Richfield Co.,* 625 F.2d 1095 (3d Cir. 1980). This policy recognizes the duty of an actor to appreciate the dangerousness of an object and to act accordingly to prevent that object from causing harm to others, whether the actor be the owner/possessor of the article, *Thompson v. Reading Co., supra,* or its manufacturer/seller, *Maize v. Atlantic Refining Co.,* 352 Pa. 51, 41 A.2d 850 (1945).

The duty imposed is the duty of any "normal human being . . . to foresee those injuries which are the consequences of his acts of omission or commission which he, as a reasonable human being, should have foreseen." *Thompson v. Reading Co., supra* 343 Pa. at 600–01, 23 A.2d at 736. The duty/standard of care is, moreover, a variable concept— "[v]igilance must always be commensurate with danger. A high degree of danger calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question." *Maize v. Atlantic Richfield Co., supra* at 352 Pa. 56–57, 41 A.2d 850 quoting *MacDougall v. Pennsylvania Power & Light Co.,* 311 Pa. 387, 396–97, 166 A. 589 (1937).

Two of the more common variables which invariably invoke a higher standard of care are the use of "dangerous instrumentalities and substances", *Maize v. Atlantic Richfield Co., supra* (manufacturer of cleaning fluid held to high

standard of care because of its dangerous propensities), and the foreseeability that children are likely to use or come into contact with the dangerous object. In *Thompson v. Reading Co., supra* 343 Pa. at 599, 23 A.2d at 736, this Court stated "[y]oung children have no foresight and scarcely any apprehensiveness of danger. This is a circumstance which those owning instrumentalities [possessing] potential for harm must bear in mind, for it is every individual's duty to use toward others what due care *then* and *there* requires." *See Styer v. Reading,* 360 Pa. 212, 218, 61 A.2d 382 (1948) ("children must be expected to act upon immature judgment, childish instincts and impulses; others who are chargeable with a duty of care and caution toward them must calculate upon this, and take precautions accordingly.")

Finally, this Court has expressly embraced a cause of action in negligence recognizing that the manufacturer or seller of a product having dangerous propensities has a duty to warn those who will come in contact with the product of those dangers, and that the warnings must be adequate to inform such persons of the risks. *Thomas v. Avron Products Co.,* 424 Pa. 365, 227 A.2d 897 (1967) (seller of varnish product owes duty to user to exercise reasonable care and to give adequate warning of the dangerous nature of the substance); *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971) (manufacturer of antibiotic owes duty to user to exercise reasonable care and to give adequate warning of risks inherent in product's use—marketing techniques designed to stimulate use of potentially dangerous product must be considered in testing adequacy of warning); *Maize v. Atlantic Refining Co., supra* ("That the conspicuous display on each of the four sides of a can [of cleaning fluid] of the words "Safety-Kleen" would naturally *lull the user* of that fluid so-named into *a false sense of security* might also reasonably have been foreseen by the defendant"—manufacturer failed to give adequate warning to dispel that false sense of security).

In light of the foregoing, well-established body of negligence principles, the lower court's ruling ("plaintiff failed to

show any of the necessary elements") is not compatible with the evidence presented at trial. There can be no doubt that Daisy owed a duty to exercise the *highest* standard of care toward James Sherk. Daisy manufactured a highly dangerous instrumentality—a gun capable of penetrating a human skull—and placed it upon a market ordinarily associated with non-lethal BB-guns used by children. One of those children was killed while playing with the gun.

There is also substantial evidence from which the jury could have inferred that Daisy breached that duty—a breach of duty consists of any act which subjects an innocent person to an unnecessary risk if the risk outweighs the advantage accruing to the actor. *Clewell v. Pummer* 384 Pa. 515, 121 A.2d 459 (1956). The risk in this case was exceedingly great—not only was it *foreseeable* that a child might fire the Power King at another child, but there is *uncontradicted* evidence that Daisy *actually knew* that its cautionary instructions accompanying traditional Daisy BB-guns were ignored by children and caused injuries, in those instances, of a less serious nature.[3] Despite such knowledge, the Power King was marketed in a manner which predictably resulted in its purchase by a youth. Balanced against that extreme risk, the jury would weigh the advantage accruing to the actor by its conduct in so marketing the Power King without age limitations or warnings that the gun could kill. The "advantage" to the actor (Daisy) would appear to be that more, and younger, children would purchase the gun, *i.e.,* that the Power King would appeal to a larger market. From these facts, a jury might well have found Daisy's conduct to have been unreasonable and negligent in placing a product on a market under a logo conveying a certain image of safety without taking adequate precautions to disassociate the Power King from that image. *See Incollingo v. Ewing, supra* 444 Pa. at 292, 282 A.2d at 226. ("When a required warning is retained unchanged in the face of

3. *See, e.g.,* testimony of Guy Braughler, Daisy's chief product evaluator (Notes of Testimony, September 29, 1977, at 285) and of Mr. Henry Francis Waring, Daisy's director of research and development (N.T. at 391).

being widely disregarded, and the supplier knows or has reason to know of such wide disregard, a jury may be permitted to find the warning insufficient.") Indeed, given the known power of the gun and the known failure of children to adhere to the cautionary instructions accompanying Daisy BB-guns, it was *virtually inevitable* that such a tragic death as James Sherk's would occur if the Power King were marketed in a manner substantially similar to the other BB-guns without adequate warning of the danger of death.

Discussion of the element of causation will be reserved for section III, *infra*. For the present, suffice it to say that Daisy's breach of duty was undeniably a "substantial factor" in bringing about the death of James Sherk. *Whitner v. Von Hintz*, 437 Pa. 448, 263 A.2d 889 (1970). I cannot fathom the assertion in the opinion announcing the result of the Court that "Robert Saenz had possession of the Power King *only because* he had disobeyed his parents' directions not to use the rifle," at 619 (emphasis added); this viewpoint ignores appellee's theory of the case which was not simply, as the opinion states, "had the lethal propensity been known, Robert Saenz would never have directed the Power King at James Sherk's head . . .", *id.* at 617, but was, more accurately, that had Daisy not manufactured and marketed a lethal weapon and distributed it in the toy market, Robert Saenz would never have had such a dangerous instrument in his hands in the first place; because Daisy did, Robert Saenz had access to a weapon (disguised as a *toy*) which he otherwise would not have. Moreover, such an assertion suggests that the Power King simply appeared in the hands of Robert Saenz, and completely ignores the paramount role played by Daisy.

Let us hypothesize the following: a youth of fourteen takes his parents' car for a joy ride despite their express admonitions to the contrary; while driving at an excessive rate of speed (which he also knows he should not do), a pedestrian crosses his path in a walkway; he applies the brakes but, due to a manufacturer's defect, they fail and the

pedestrian is struck and injured; had the brakes not malfunctioned, the car would not have struck the victim. Is the fact that this youth "had possession of the [car] only because he had disobeyed his parents' directions not to use the [car]" of *any* relevance to the issue of whether the defect in the product was a legal cause? I submit not—such a statement in the hypothetical situation, as well as in the instant situation, is a *non sequitur* as the defect in each manufacturer's product was assuredly a "substantial factor" in the cause of each injury. If the manufacturer's conduct (negligence) or a defect in his product (strict liability) is a substantial factor in causing the injury, the intervening negligent act of a third party can *only* relieve the manufacturer of liability if that intervening act is determined to be a *superceding cause* under the analysis adopted by this Court in *Estate of Flickinger v. Ritsky,* 452 Pa. 69, 305 A.2d 40 (1973), adopting section 447 of the Restatement (Second) of Torts, uniformly followed by the courts of this Commonwealth since. Conspicuous by its absence, the opinion announcing the result of the Court does not even mention section 447, nor does it proffer any analysis of the concepts of intervening and superceding causes. I shall address these concerns fully in section III.

I would hold, therefore, that the lower court erred in refusing to charge the jury on Daisy's potential negligence.

## II. *Admissibility of Evidence in Strict Products Liability/Failure to Warn Cases*

As noted earlier, the trial court restricted plaintiff-appellee's evidence regarding advertising and marketing of Daisy products to only such evidence which pertained specifically to the Power King, holding:

> It was plaintiff's contention that the community was lulled into a false sense of security about the safety of Daisy BB-guns. Such a contention, whether true or not, is not relevant. As in any given case, the Court must deal with the facts before it. Then the law must be applied to the parties as the circumstances and facts reveal. Generalities about the community have no place in this process.

The specific perceptions of the defendant parents and son were that the gun was not lethal. This was shown by their testimony before the jury. Thus, the question considered by the jury was whether the warnings and instructions enclosed with the gun were sufficient to inform the user of the risks created by the product. This was entirely proper under the facts in this case.

The court's evidentiary rulings were governed by its interpretation of *Berkebile v. Brantly Helicopter Co., supra* (see Notes of Testimony, September 29, 1977 at 31–32) which interpretation was in accord with this Court's subsequent pronouncement in *Azzarello v. Black Brothers Co., Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978). The evidence excluded by the trial court pursuant to *Berkebile* included: the knowledge and experience of Allegheny County detectives regarding the frequency and likelihood of death and/or injuries from traditional BB-guns, (N.T. at 41 and 71); the knowledge and experience of Mr. and Mrs. Saenz regarding their prior perceptions of Daisy BB-guns, (N.T. at 77 and 131–32); the knowledge and experience of Mr. and Mrs. Saenz regarding their prior perceptions of Daisy BB-guns as influenced by Daisy advertisements in various youth-oriented publications, (N.T. at 74–75, 157); the knowledge and experience of the chief product evaluator regarding prior injuries inflicted by traditional Daisy BB-guns, (N.T. 252–55, 262); advertisements of the Power King which were not actually seen by the Saenzes, (N.T. at 321); and evidence that Daisy BB-guns were advertised in Boy's Life Magazine, (N.T. at 442).

While the lower court's evidentiary rulings were understandable in light of certain language in *Berkebile* and *Azzarello,* I am nevertheless convinced that plaintiff-appellee's contention (regarding the "false sense of security about the safety of Daisy BB-guns" arising from misleading marketing techniques, and mislabeling by use of the Daisy logo) is not only *relevant* to this case, but further, is *absolutely indispensible* to a proper understanding of the nature of such a defect and to the determination of whether a defective condition existed due to an absence or inadequacy of

warnings concerning the lethal propensities of the Power King.

Before examining the specific problem in this case, a review of *Azzarello v. Black Brothers, Co., Inc., supra,* is in order.[4] *Azzarello* recognized that the "development of a sophisticated and complex industrial society with its proliferation of new products and vast changes in the private enterprise system has inspired a change in legal philosophy from the principle of caveat emptor . . . to the view that a supplier of products should be deemed to be the 'guarantor of his products' safety'". 480 Pa. at 553, 391 A.2d at 1023 (citation omitted). Yet despite the terminology ("guarantor"), the theory of strict products liability "was not intended to make [the supplier] an insurer of all injuries caused by the product." *Id.,* 480 Pa. at 553, 391 A.2d at 1024.

The difficult problem is in devising an appropriate limitation on a supplier's liability that will prevent him from being absolutely liable (as an insurer) while simultaneously deeming the supplier the "guarantor" of his products' safety. *Id.,* 480 Pa. at 553–54, 391 A.2d at 1024. This Court was not totally satisfied with the approach to this problem taken by the drafters of the Restatement (Second) of Torts, i.e., that imposition of liability for injuries caused by a product is justified where that product is "defective", or, in the words of the Restatement, where the product is in a "defective condition unreasonably dangerous." Section 402A(1). While the concept of "defect" in a product is clear, concise and meaningful in the manufacturing/fabrication defect situation (because the "defect" is a visible or otherwise measurable fault, flaw or blemish), the concept is less helpful when dealing with a non-manufacturing type defect (i.e., a design defect or a defect due to failure to give adequate warnings). *Id.,* 480 Pa. at 554–55, 391 A.2d at 1024–25. The

---

4. Appellant relies only on *Azzarello* and *Berkebile* to support its position that the Superior Court should be reversed. While *Azzarello* was decided after the trial of the instant case, the interpretation of *Berkebile* in *Azzarello* is consistent with the trial court's interpretation of *Berkebile* which governed the court's evidentiary rulings. Thus, I will focus primarily on the *Azzarello* decision.

critical Restatement factor in those situations is whether the product is "unreasonably dangerous." *Id.,* 480 Pa. at 555, 391 A.2d at 1024.

The dissatisfaction with the "unreasonably dangerous" formulation is that it "tends to suggest considerations which are usually identified with negligence" and, thus, "it has burdened the injured plaintiff with proof of an element which rings of negligence." *Id.,* 480 Pa. at 555, 391 A.2d at 1025, relying on *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972). Accordingly, *Azzarello* held that negligence terms such as "unreasonably dangerous" had no place in a strict liability cause of action nor in a jury instruction.

*Azzarello's* "solution" to the problem of finding an appropriate limitation was to allow the judge to determine at the outset whether the condition of the product was such as to justify placing liability upon the supplier, as a lay finder of fact was viewed as less competent than the court, in non-manufacturing defect cases, to decide whether the risk of loss should be shifted to the supplier. Once the court decides whether, under plaintiff's averments and proofs, recovery would be justified, the court then sends the case to the jury with a standard instruction that it may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature or condition that rendered it unsafe for the intended use. *Id.* 480 Pa. at 559, 559 n.12, 391 A.2d at 1027, 1027 n.12.

*Azzarello* left open, however, the question "what is a defect?" in situations wherein a defect is asserted because warnings are absent or inadequate. *Id.,* 480 Pa. at 559, n.11, 391 A.2d 1027, n.11. That question must now be addressed in order to assess the validity of the evidentiary rulings below.

The Superior Court held that even though *Azzarello* eliminated "unreasonably dangerous" and similar language which "range of negligence" from the jury's consideration, it did not preclude the trial court from articulating a meaningful

definition of "defect" appropriate to the circumstances of the case. 427 A.2d at 662. In cases in which a defect is asserted due to a lack of or inadequate warnings, the court stated it would be misleading to rely on the rather sparse *Azzarello* definition of "defect". *Id.* Following a line of California Supreme Court decisions,[5] the Superior Court concluded that, in failure to warn cases, in order to ensure the jury's understanding of the nature of the alleged defect, the trial court should

> focus their attention on such relevant considerations as the normal expectations of the consumer as to how the product will perform, degrees of simplicity or complication in the operation or use of the product, the nature and magnitude of the danger to which the user is exposed, the likelihood of injuring and the feasibility and beneficial effect of including a warning. *Cavers v. Cushman Motor Sales, Inc., supra,* 95 Cal.App.3d at 347, 157 Cal.Rptr. at 148.

427 A.2d at 662. As the necessity of a warning depends in part on "ordinary consumer expectations" with the ordinary knowledge common to the community as a characteristic of the product, the Superior Court held it was error to exclude evidence tending to show such expectations and community knowledge.

I agree with the Superior Court that evidence pertaining to ordinary consumer expectations with the ordinary knowl-

---

**5.** In *Barker v. Lull Engineering Co., Inc.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), the California Supreme Court upheld the *Cronin* decision, but emphasized that *Cronin* did not preclude a trial court from framing a definition of "defect", suitable and tailored to the particular circumstances of the case, to guide the jury. The *Barker* court noted that in design defect cases, the bare *Cronin* statement of defect was vague and apt to be misleading to a jury, and so devised a two-pronged test: a product is defective in design if (1) it fails to meet the threshold—expectations of the ordinary consumer using the product in an intended or reasonably foreseeable manner or (2) if, in light of numerous relevant factors, the benefits of the challenged design do not outweigh the risk of danger inherent in such design. *Cavers v. Cushman Motor Sales, Inc.,* 95 Cal.App.3d 338, 157 Cal.Rptr. 142 (1979) then extrapolated the rule of *Barker* to failure to warn defect cases.

edge common to the community is relevant to the necessity for and adequacy of a warning.[6]

A defect due to a failure to adequately warn is a defect *extrinsic* to the product itself and the adequacy of (or need for) a warning is a determination that cannot be made in a vacuum containing only the physical properties of the product. Twerski, Weinstein, Donaher and Piehler, *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age,* 61 Cornell L.Rev. 495, 513 (1976) (hereinafter cited as *Donaher); see Ryes v. Wyeth Laboratories,* 498 F.2d 1264, 1273 (5th Cir. 1974). In the manufacturing and/or fabrication defect situation there exists an *intrinsic* flaw, blemish or imperfection of some sort which is physically demonstrable, i.e. the jury may see or touch the defective product and can compare it to a perfectly manufactured product of the same product line. However, the problem of finding a defect in a perfectly constructed product is conceptually different. Korpela, Annotation, *Failure to Warn As Basis of Liability Under Doctrine of Strict Liability in Tort,* 53 A.L.R.3d 239, § 2 at 243, (hereinafter cited as *Korpela).*

When trying to identify a defect for failure to adequately warn or for improper design, any "defect" becomes apparent only by additionally looking at a configuration of elements external to the product—in the non-manufacturing/fabrication context, then, "defect" is used in a special sense. *Korpela, supra;* Wade, *On Product "Design Defects" And Their Actionability,* 33 Vand.L.Rev. 551, 551–52 (1980) (hereinafter cited as *Wade);* Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence,* 33 Vand.L.Rev. 593, 648 (1980) (hereinafter cited as *Birnbaum); Phillips v. Kimwood Machine Co.,* 269 Or. 485, 525 P.2d 1033 (1974); *Barker v. Lull Engineering Co., Inc., supra* note 5.

**6.** It would seem clear without lengthy analysis that the evidence ruled inadmissible would have been relevant to the cause of action in negligence under the principles enunciated in section I. However, plaintiff-appellee's offers of proof at trial and position on appeal were based upon the relevance of the evidence to the strict liability theory and, therefore, I confine the evidentiary discussion to that theory.

The problem of devising a workable standard of "defect" which accomplishes the twin objectives of limiting a supplier's liability to injuries caused by identifiable "defects" (including those caused by lack of adequate warnings), while still preventing negligence concepts from slipping back into the strict liability arena, is undoubtedly the most troublesome and controversial problem in products liability law today. *See, e.g. Wade, supra* at 576; Twerski and Weinstein, *A Critique of the Uniform Products Liability Law—A Rush to Judgment,* 28 Drake L.Rev. 221, 234 (1978–79); *Korpela, supra;* O'Donnell, *Design Litigation and Strict Liability: The Problem of Jury Instructions Which Do Not Instruct,* 56 U.Det.J.Urb.Law 1051 (1979); *Phillips v. Kimwood Machine Co.,* 269 Or. 485, 525 P.2d 1033 (1974) ("This court and other courts continue to flounder while attempting to determine how one decides whether a product is in a defective condition. . . .", especially in failure to warn and design defect situations).

The overwhelming majority of the courts and commentators are in agreement that in making a determination of defect in such cases, the focus must be on the product and not on the manufacturer's conduct. *See* cases cited in section I (at 619); *see also Donaher, supra* at 511–12; *Wade, supra* at 553; *Korpela, supra* § 2. However, despite diligent efforts to devise a standard or definition that will give substance to the word "defect" in the non-manufacturing defect context while attempting to ensure that a manufacturer will not be liable for all injuries caused by his products absent some objective evidence of a defect, experience in other jurisdictions highlights the difficulty of preventing negligence concepts in one form or another from creeping back into the strict liability cause of action. Some of the more prominent efforts are:

A. The *Barker v. Lull Engineering Co., Inc.*—California Approach

As noted, this approach is two-fold. A product is defective in design if it fails to meet ordinary consumer expecta-

tions (this is the minimum—the threshold); if it does, then a number of factors are examined in a risk/utility balancing. Those factors are listed in the next section. *See also, Aller v. Rodgers Machine Manufacturing Co.,* 268 N.W.2d 830 (Iowa 1978); *Lunt v. Brady Manufacturing Corp.,* 13 Ariz. App. 305, 475 P.2d 964 (1970); *Estate of Ryder v. Kelly-Springfield Tire Co.,* 91 Wash.2d 111, 587 P.2d 160 (1978); *Heaton v. Ford Motor Co.,* 248 Or. 467, 435 P.2d 806 (1967).

B. The "Wade-Keeton" Factors Analysis

Under this approach, a set of criteria is given the jury upon which to evaluate the risks of a product against its utility. These factors may include:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance. [footnote omitted]

*See* Wade, *On the Nature of Strict Tort Liability For Products,* 44 Miss.L.J. 825, 837–38 (1973); Keeton, *Product Liability and the Meaning of Defect,* 5 St. Mary's L.J. 30, 37–38 (1973). This analysis, in one form or another, has been used by several jurisdictions. *See, e.g., Bowman v.*

*General Motors Corp.,* 427 F.Supp. 234 (E.D.Pa.1974); *Hagans v. Oliver Machinery Co.,* 576 F.2d 97, 99–100 (5th Cir. 1978); *Turner v. General Motors Corp.,* 584 S.W.2d 844 (Tex.1979); *see also O'Donnell, supra* at 1058–62; *Birnbaum, supra* at 605.

## C. The "Reasonably Prudent Manufacturer" Presumed to Have Known of the Risk

A number of jurisdictions have taken this approach or a variation—a product is defective in design if it is so likely to be harmful that a reasonably prudent manufacturer who had *actual knowledge* of its harmful character would not place it on the market. *See, e.g., Phillips v. Kimwood Machine Co.,* 269 Or. 485, 525 P.2d 1033 (1974); *Cepeda v. Cumberland Engineering Co., Inc.,* 76 N.J. 152, 386 A.2d 816 (1978) as modified by *Suter v. San Angelo Foundry and Machinery Co.,* 81 N.J. 150, 406 A.2d 140 (1979); *Brady v. Melody Homes Manufacturing,* 121 Ariz. 253, 589 P.2d 896 (1978). Under this approach, some commentators have suggested the standard becomes very much like negligence minus the necessity to prove foreseeability. *See Wade, supra* at 56 and *O'Donnell, supra* at 1067–70; *Birnbaum, supra* at 618. The New Jersey experience is an example of the complexity of the problem of defining "defect": *Cepeda* was viewed as firmly establishing this approach, and was cited as the front-runner of a trend. *See Wade, supra* at 562 and *O'Donnell, supra* at 1067–70. However, the definitive statement of *Cepeda* was short-lived, as noted in Justice Clifford's concurring opinion in *Suter,* to-wit: "I deplore the bluntly administered coup de grace to *Cepeda* ..., barely weaned and now the victim of judicial infanticide.... [T]he Court has chosen to treat *Cepeda* as (to borrow Justice Stone's expression) 'not better than an excursion ticket, good for [that] day and trip only ...'" 81 N.J. at 179, 406 A.2d 140.

Under these approaches, especially the latter (c), the attempt to maintain a distance from negligence concepts is not entirely successful. Notions of manufacturer's conduct and fault have inexorably found their way back into the defini-

tion of defect and the purported "focus on the product" is, in many cases, mere "semantic gymnastics". *Birnbaum, supra* at 601. Some courts have apparently decided that concepts of negligence are inseparable from an understanding of defect in design and failure to warn cases. *See e.g., Hohlenkamp v. Rheem Manufacturing Co.,* 123 Ariz. 535, 601 P.2d 298 (1979); *Anderson v. Klix Chemical Co.,* 256 Or. 199, 472 P.2d 806 (1970) overruled by *Phillips v. Kimwood Machine Co., supra* insofar as it held that there was no difference between negligence and strict liability in failure to warn cases. *Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir. 1969); *Sterling Drug, Inc. v. Yarrow,* 408 F.2d 978 (8th Cir. 1969). This is the approach advocated by the Task Force of the United States Department of Commerce who have drafted the Uniform Products Liability Act. The Uniform Act proposes abandoning the cause of action for strict liability altogether for design and failure to warn defects, relying exclusively on negligence in those cases.

And at least one court has agreed with Professor Henderson that non-manufacturing defect cases that require courts to set independent product safety standards by judging existing designs as defective are beyond the limits of adjudication. *Owens v. Allis-Chalmers Corp.,* 83 Mich.App. 74, 268 N.W.2d 291 (1978) (extrajudicial safety standards set by industry, voluntary association or government are determinative on issue of defect—if in compliance with those standards, no defect); Henderson, *Judicial Review of Manufacturer's Conscious Design Choices: The Limits of Adjudication,* 73 Colum.L.Rev. 1531 (1973). *See Donaher, supra* for critical response to Professor Henderson's suggestions.

This overview of the approaches to defining defect taken by various authorities is far from an exhaustive analysis, and is not intended as such. It is intended only to highlight the complexities of the problem as demonstrated by the confusion and uncertainty in the area. Starting with the basic assumption relied on in *Azzarello,* and shared by the vast majority of courts, that the focus of strict products

liability *is and should be on the product*,[7] much of the confusion can perhaps be avoided if one conceptualizes *the product itself as the "defendant" in the case.* Within this framework, the trial court should direct the jury's attention to the "invitational aspect" of the product, that is, those characteristics, both apparent physical properties as well as externalities such as marketing, promotional activities, labels, logo, prior use of similar items, etc., that combine to evoke a particular image of the product in the mind of the consumer as to the product's function, its capabilities, the risks inherent in its use, and its limitations. The popular perceptions in the marketplace cannot be divorced from the product. As then Chief Justice Jones stated in *Berkebile v. Brantly Helicopter Corp., supra* 462 Pa. at 102–03, 337 A.2d 893:

> The necessity and adequacy of warnings in determining the existence of a defect can and should be considered with a view to *all the evidence.* The jury should view the *relative degrees of danger associated with use of the product* since a greater degree of danger requires a greater degree of protection.... The issue of necessity and adequacy of warnings and instructions for use must also be considered *in light of any contradictory promotional activities* on the part of the seller. (emphasis added; citations omitted)

A product thus "speaks" to society through its "invitational aspect", as ascertained both by its apparent physical properties and by various (and varying) external factors. Such an approach relegates the role of the manufacturer's conduct and other negligence concepts to the insignificance consistent with strict product liability, and elevates to requisite prominence the pivotal interplay between product and users (society).

The instant case amply illustrates the necessity of knowing a product's extrinsic characteristics in order to assess the

---

7. One of the initial forays into the theory of strict liability, *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916), authored by Judge Cardozo, directed the attention of the courts to the "nature of a thing".

adequacy of warnings, and to determine whether a defect exists for lack of adequate warnings. The strict liability theory advanced at trial was that the Power King was defectively designed *for the market in which it was placed* because, in that market Daisy BB-guns, through the labels and logos attached to and associated with them, conveyed a certain image as play guns that were relatively safe for use by children, and by introducing the Power King on that market without warnings adequate to inform the user that *this gun was unlike those other BB-guns with their image of safety,* (i.e., in effect, the Power King was mislabeled) it was in a defective condition which condition caused James Sherk's death. In attempting to introduce evidence of external factors, the plaintiff-appellee was merely endeavoring to prove one of the characteristics of the Power King, its "invitational aspect".

If the jury was to have properly evaluated the adequacy of the warnings given, they had to have been fully apprised of the seriousness of the danger—the *hidden* danger of death inherent in a gun such as the Power King placed on the traditional BB-gun market. That danger could *only* be comprehended by a knowledge of the image projected by other Daisy BB-guns in order to appreciate "how much warning is adequate?".

There emerges in the instant case, the reality that the use of the logo "Daisy" with the Power King is of paramount significance in the public mind in that it creates popular expectations as to how the gun will operate (as a play gun), by whom it will be used (children), and with what probable results (bruises, stings, or at worst, a lost eye). The Power King accompanied by the Daisy logo[8] "invites" use by a young boy in a manner substantially the same as the use "invited" by traditional Daisy BB-guns, *despite the expectations or the use "intended" by the manufacturer.* In effect, it "speaks" to prospective purchasers saying "Use me as a

8. It is noteworthy that after the accident in this case, the Daisy logo was removed from the shipping box and advertisements, and the Power King was recommended for use by youths sixteen years of age, or older.

BB-gun—I can hurt but not kill", regardless of warnings that it may be "more powerful".

The majority of this Court seem to have been seduced by Daisy's argument that Daisy subjectively intended the Power King to be used only for target practice, and included instructions to that end. Yet such intent is irrelevant where it was mislabeled and marketed under the Daisy logo in a manner substantially similar to the marketing of other BB-guns which were, despite cautions and instructions accompanying those guns, occasionally fired at other children causing less severe injuries. (Daisy's officers, in fact, were aware that their instructions were sometimes ignored. Testimony of Guy Braughler (N.T. at 285) and Henry Waring (N.T. at 391).) Despite the language of "intended use" in the *Azzarello* definition of "defect", "intended use" cannot be construed to be a ceiling on the manufacturer's liability since, as occurred here, the product might well invite other non-"intended" uses. The rationale of *Azzarello* was to *relieve* the plaintiff of added burdens of proving elements that ring of negligence, yet the elevation of "intended use" to a supplier's defense, as the lower court rulings and the majority have done in effect, would impose the ultimate burden upon the consumer—the burden of proving the manufacturer/seller's subjective intent. The negligence concepts of a supplier's fault or lack of fault have been interjected into the dispute, contrary to the admonitions of *Azzarello* and of *Berkebile*. *Berkebile* stated "[b]ecause the seller is liable in strict liability regardless of any negligence, whether he could have foreseen a particular injury is irrelevant in a strict liability case." If a supplier's foreseeability is irrelevant, it goes without saying that the supplier's *intent* is irrelevant. Accordingly, the language "lacking any element necessary to make it safe for its *intended use* or possessing any feature that renders it unsafe for the *intended use* ", 480 Pa. at 559, 391 A.2d at 1027, must be read merely to establish the supplier's *minimum* duty, i.e., the product must *at least* be safe for its intended use.

I would hold, therefore, that it was error to exclude the proffered evidence which would have tended to demonstrate the "invitational aspect" of the Power King. The "ordinary consumer expectations" certainly were relevant to the "invitational aspect" as they had a direct bearing on the degree of danger associated with the product, as did the promotional activities regarding traditional Daisy BB-guns. The same is true of the incidence of injury, and the extent and type of injuries, normally associated with BB-guns. The evidence of factors external to the Power King was relevant to the image of relative safety of similar guns, without which evidence the jury could not accurately assess "how much warning was adequate" to dispel that image and false sense of security. *See Maize v. Atlantic Refining Co., supra.* In a strict products liability action based upon failure to adequately warn, the trial court should admit all otherwise admissible evidence tending to demonstrate the product's physical characteristics as well as evidence of factors extrinsic to the physical properties of the product which illustrate its "invitational aspect".[9]

## III. *The Element of Causation*

As highlighted by the opinion announcing the result of the Court, another persistently recurring problem area in the development of products liability law has been the trouble-

**9.** The necessity of such evidence is perhaps more apparent in this hypothetical. Take the same situation presented herein, only substitute a 30/30 rifle for the Power King. Assuming the same marketing activities and use of Daisy logo, and assuming warnings which said only "this gun is much more powerful than the traditional Daisy BB-gun," it would be virtually impossible for the jury to determine the adequacy of the warning without knowing of the sense of security that attaches to the BB-guns. In the absence of evidence showing that "sense", the jury would have to decide the case in a vacuum, looking only at the physical characteristics of the rifle (including the warnings, instructions and advertisements specifically relating to it), and might decide, not being sufficiently aware of the danger fostered by that sense of security, that there was no defect because the warnings were adequate. The jury in the instant case, because of the evidentiary rulings, was operating under a similar handicap—the difference between this hypothetical and the situation actually presented is merely one of degree, and a slight one at that.

some, yet widely discredited, concept of "clear and obvious danger". *Donaher, supra* at 507–09; *see, e.g., Ford v. Highlands Ins. Co.,* 369 So.2d 77 (Fla.App.1979) *and Hensley v. Muskin Corp.,* 65 Mich.App. 662, 238 N.W.2d 362 (1978). *See* comment j of the Restatement (Second) of Torts § 402A cited in that opinion, slip opinion at 2, n.2. This concept has emerged as a defense in various guises. The argument has been made, as Mr. Justice Roberts herein advances, that since the condition of the product is patently or obviously dangerous, that condition cannot be regarded as a "defect" in the product.[10] In other instances, courts have observed that the user of a product need not be warned of a condition which is, or would be, obvious to him.[11] This concept has emerged as well in the context of assumption of the risk.[12] Regardless of the label used in individual cases, the consequence of a court's acceptance of the concept has been to sanction the marketing of a defective product and to justify such an unconscionable result by explicitly or implicitly castigating the conduct of the user of the product.

This approach, which is so alien to the fundamental precepts of product liability law, gives rise to consternation when the injured party is the user of the product. When the injured party was, however, *a wholly innocent bystander,* as in the instant case, who had no opportunity to perceive the "obvious danger" and take protective steps to ward it off, the full extent of the viciousness of this approach is revealed.

Perhaps the most surprising aspect of this pernicious concept is that it masks the reality that the courts have, in fact, retreated to the outmoded "but for" causation test in

10. *E.g., Garrett v. Nissen Corp.,* 84 N.M. 16, 498 P.2d 1359 (1972) *and Posey v. Clark Equipment Co.,* 409 F.2d 560 (7th Cir. 1969), *cert. denied* 396 U.S. 940, 90 S.Ct. 374, 24 L.Ed.2d 242.

11. *E.g., Borjorquez v. House of Toys, Inc.,* 62 Cal.App.3d 930, 133 Cal.Rptr. 483 (1978) *and Walter v. Valley,* 363 So.2d 1266 (La.App. 1978).

12. *E.g., Hagans v. Oliver Machinery Co.,* 576 F.2d 97 (5th Cir. 1978) *and Brown v. North American Manufacturing Co.,* 176 Mont. 98, 576 P.2d 711 (1979).

place of the "substantial factor" test as the determinant causation element. In an era when the complexity of life argues for a less simplistic approach than the "but for" test in the general area of negligence law,[13] it is ironic that the "but for" test, cloaked in a disguise of "obvious danger", should reemerge to subvert the critical factors of product liability, and thereby exalt the actions of the product user to preeminence.

Even if we were to conclude from a reading of the trial record that the child/user of the accused product in this case was *fully* cognizant of the propensities of this weapon to inflict serious injury and death, it ill behooves us to exonerate the culprit/manufacturer who has so marketed this lethal product as to give every promise that its life-threatening potential will be realized. If the complicity of the product-user was essential to bring about the tragedy in this case, *how much greater was the responsibility of the toy manufacturer,* marketing this product with the familiar *toy* logo and *toy* name and *without* the kind of warning which would leap to the eye and alert the prospective user that here was a *toy* in name only, but was in fact a *weapon* designed to function as a lethal instrument.

Accepting arguendo the highly dubious argument that the product user was, or should have been, aware of the extraordinarily hazardous nature of this product, and that his actions were the immediate cause of the mortal wound, it is beyond dispute that the manufacturer's placing this product in the market place and ultimately into the user's hands constituted a "substantial factor" contributing to the injury and death. If that product was in fact defective, by virtue of its use of name and logo familiar in a wholly different

13. Pennsylvania has rejected the "but for" test for causation and adopted the "substantial factor" test as embodied in the Restatement (Second) of Torts § 431 which provides: "The actor's negligent conduct is a legal cause of harm to another if: (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence resulted in the harm." *See, e.g., Whitner v. Von Hintz,* 437 Pa. 448, 263 A.2d 889 (1970) *and Takach v. B.M. Root Co.,* 279 Pa.Super. 167, 420 A.2d 1084 (1980).

context and because of inadequate accompanying warning, it must be recognized that the paramount factor in the sequence leading to the death of the user's playmate was the manufacture and marketing of this defective product.

The *mere* happenstance of a third party's negligent act does not of itself relieve the original tortfeasor from liability for *his* negligent conduct which is a substantial factor of the injuries complained of. *See Grainy v. Campbell,* 493 Pa. 88, 425 A.2d 379 (1981). As this Court stated in *Estate of Flickinger v. Ritsky,* 452 Pa. 69, 74, 305 A.2d 40, 43 (1973), the "controlling *rule of law* in Pennsylvania on the extent of liability of a negligent actor, i.e., the law of proximate causation, where that question is presented in the light of an intervening act of negligence, is contained in section 447 of the Restatement (Second) of Torts" which provides:

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>
> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, *or*
>
> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, *or*
>
> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent. (Emphasis supplied).

*See also Grainy v. Campbell, supra and* 410 Pa. 92, 188 A.2d 734 (1963). In the instant case, *each* aspect of section 447 is invoked: (a) the actor—Daisy—not only *should have realized* that young children would act in the manner in which Robert Saenz did act, but Daisy *actually knew* that such acts would occur since other children had, by Daisy's admission, ignored instructions accompanying traditional BB guns and had fired them at other children causing injuries; (b) a

reasonable man, knowing that children had shot other children with similar less powerful guns despite warnings, would not consider it highly extraordinary that Robert Saenz would do the same with the more powerful Power King marketed under the Daisy logo; and (c) the intervening act—Robert Saenz pulling the trigger of the Power King—was a normal consequence of the situation created by Daisy's conduct, and was certainly not extraordinarily negligent—indeed it was quite predictable. As this Court has stated, " '[a]n original fault carries as far as its aggressive quality influences the movements of those who come within the boundaries of its unspent force.' . . . The setting of a dangerous situation which may be triggered, negligently or innocently, to the harm of a third person is the basic tortious act, and the original tortfeasor may not escape liability by emphasizing the negligence of the second tortfeasor . . . ." *Shimer v. Bangor Gas Co.,* 410 Pa. 92, 98–100, 188 A.2d 734, 737 (1963), quoting *Thornton v. Weaber,* 380 Pa. 590, 112 A.2d 344 (1955).

Moreover, in situations such as is here presented, where proximate causation is at issue because of an alleged intervening negligent act of a second tortfeasor, we have consistently held such issues to be a matter for the jury's determination. *Ross v. Vereb,* 481 Pa. 446, 451, 392 A.2d 1376, 1378 (1978); *Miller v. Checker Yellow Cab Co.,* 465 Pa. 82, 87–89, 348 A.2d 128 (1975); *Kuisis v. Baldwin-Lima-Hamilton Corp.,* 457 Pa. 321, 330–31, 319 A.2d 914 (1974); *Estate of Flickinger v. Ritsky, supra.* In *Miller v. Checker Yellow Cab Co., supra* at 465 Pa. 87, 348 A.2d 128, Justice Nix stated "it is a long standing maxim that a trial court must submit questions of negligence to the jury", and cites with approval comment b to section 453 of the Restatement (Second) of Torts, to-wit:

If, however, the negligent character of the third person's intervening act or the reasonable foreseeability of its being done is a factor in determining whether the intervening act relieves the actor from liability for his antecedent negligence, and under the undisputed facts there is

room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question should be left to the jury.

The jury must not focus on the subjective awareness of the second actor but on the objective criteria identified in § 447, namely: (a) the foreseeability of the second actor's conduct, (b) whether a reasonable man would regard the intervening conduct as extraordinary, or (c) whether the intervening conduct was a normal consequence. *Grainy v. Campbell, supra,* 493 Pa. at 94, 425 A.2d at 382–83. In *Kuisis v. Baldwin-Lima-Hamilton Corp., supra,* cited in the majority opinion, Justice Pomeroy wrote:

> Given the occurrence of a [defect], the operator's [the second tortfeasor's] alleged negligence assumes legal significance *only if it was a superceding cause* of [the plaintiff's] injuries. *Questions of proximate causation should normally be left to the finder of fact,* and this case is no exception.... Moreover, even if the operator's negligence was a cause in fact of the accident, it would not be a superceding cause unless this negligence were outside [the defendant/manufacturer's] reasonable range of foreseeability. The existence of the brake locking device [the defective product involved] was an invitation to its use. Whether [the defendant/manufacturer] should have foreseen that an operator [might use it in a negligent manner] *was a question for the jury."* 457 Pa. at 330–31, 319 A.2d 914, citing section 447 of the Restatement (Second) of Torts (emphasis added). *See* authority cited *id.,* 457 Pa. at 331, n. 13, 319 A.2d 914 n. 13.

Despite the well established and well founded precedent, the opinion of Mr. Justice Roberts announcing the result of the Court posits, *as a matter of law,* that "because this record demonstrates that Robert Saenz is legally chargeable with sufficient appreciation of the nature of the risk of his misuse of the Power King, he is exclusively responsible for the consequences of his misuse," at 618, and in so doing, has abandoned section 447 of the Restatement (Second) of Torts, the *"controlling rule of law in Pennsylvania* on the extent of

liability of a negligent actor, where that question is presented in the context of an intervening act of negligence," *Miller v. Checker Yellow Cab Co., supra* at 465 Pa. 86, 348 A.2d 128, has abandoned section 453 of the Restatement (Second) of Torts, *id., and* has attempted to overrule sub silentio an entire body of Pennsylvania law concerning causation (substantial factor, proximate cause, intervening cause and superceding cause), including *Estate of Flickinger v. Ritsky, supra; Miller v. Checker Yellow Cab Co., supra, Ross v. Vereb, supra; Kuisis v. Baldwin-Lima-Hamilton Corp., supra; Grainy v. Campbell, supra; Whitner v. Lojeski,* 437 Pa. 448, 263 A.2d 889 (1970), to name just a few.

Further, I cannot accept the premise that this record demonstrates that Robert Saenz knew or should have known of the lethal propensity of the Power King. Opinion of Mr. Justice Roberts announcing the result of the Court, at 618. Despite the laborious efforts therein to extract something from the record to support this inference, *id.* at 617–618, the *most* knowledge that can legitimately be imputed to Robert Saenz is that he knew that the Power King could break bottles, pierce cans and kill rabbits and rats. *Id.* Such knowledge seems a far cry from the knowledge that the Power King could kill a human being. Most disturbing is the willingness *to take from the jury* the determination of just how much Robert Saenz knew or should have known when the evidence, despite painstaking reconstruction of the record in an attempt to buttress the chosen result, is certainly not free from doubt. Such doubt *must be resolved by the trier of fact. Miller v. Checker Yellow Cab Co., supra* at 465 A.2d 89, 348 A.2d 128.

Here, as in every product liability case, a crucial element is the *availability* of the defective product. Moreover, even the most deadly product is unlikely to present a hazard while it lies untouched on a shelf. If here, as is almost invariably the case, the product's potential for causing injury can *only* be activated by a person other than the manufacturer, there is no reason to permit that event of activation to shield the manufacturer from the consequences of its own manufactur-

ing and marketing activity. *See, e.g. Kuisis v. Baldwin-Lima-Hamilton Corp., supra* (intervening negligent act of operator of crane was foreseeable and was not, therefore, a superceding act which would relieve defendant/manufacturer of liability); *Smith v. Hobart Manufacturing Co.* 185 F.Supp. 751 (E.D.Pa.1960) (intervening cause of co-employees removing shield from meat grinder, even if negligent, was not a superceding cause and did not relieve defendant/manufacturer from strict products liability); *Dover v. Perez,* 587 S.W.2d 761 (Tex.Civ.App.1979), supp.op. 591 S.W.2d 547 (Tex.Civ.App.1980) (installer's improper use of product a proximate but not superceding cause which would relieve defendant/manufacturer of strict products liability); *Gordon v. Niagara Machine and Tool Works,* 574 F.2d 1182 (5th Cir. 1978), *reh. denied* (employer's negligent failure to warn employee/plaintiff of danger was concurrent but not superceding cause which would relieve defendant/manufacturer from liability). Indeed, to put it more succinctly, the product-user could not have killed by his act unless he had first been furnished with the defective product to accomplish that result.

The record here adequately establishes causation between the injury and the manufacturer's defective product. Arguably it meets the causation test even under a "but for" approach. Under the "substantial factor" test embraced by this Court, there can be no doubt that causation is established. The record further establishes that Robert Saenz' act of pulling the trigger, while an intervening cause, was not of such character as to constitute a superceding cause which would relieve Daisy of liability.

For the foregoing reasons, the order of the Superior Court reversing the Court of Common Pleas of Allegheny County should be affirmed and the case remanded to the latter court.

O'BRIEN, C. J., joins in this dissenting opinion.